# Cresson's Appeal.

A legacy to the Mayor and Councils of Philadelphia, in trust, as a perpetual fund, the income to be "annually for ever expended in planting and renewing shade trees, especially in situations now exposing my fellow-citizens to the heat of the sun," is a good charitable bequest.

So is a bequest to the Pennsylvania University, at Philadelphia, "to endow a professorship of the fine arts."

So is a bequest to the Pennsylvania Agricultural Society, "to be applied towards the erection and support of an agricultural college within the said state;" and parol evidence is receivable to show that The Pennsylvania State Agricultural Society is the legatee intended by the testator.

Parol evidence is receivable to show that a bequest to the "Refuge for Decayed Merchants," was intended for a charitable society, incorporated under the name of "The Merchants' Fund."

APPEAL from the Orphans' Court of *Philadelphia.*

This was an appeal by John E. Cresson and others, residuary legatees, under the will of Elliott Cresson, deceased, from the

decree of the Orphans' Court for the payment of certain legacies, bequeathed by the testator for charitable purposes.

The following bequests in the will of the testator, are those which gave rise to the present appeal:—

"Item.—I give and bequeath to the Mayor and Councils of Philadelphia the sum of $5000 in trust, as a perpetual fund, the income from which I desire shall be annually for ever expended in planting and renewing shade trees, especially in situations now exposing my fellow-citizens to the heat of the sun—desiring that due care be taken to select the best varieties of fine trees, and excluding such foreign trash as the Lombardy poplar, ailanthus, paper mulberry and similar exotics.

"Item.—I give and bequeath to the Pennsylvania University, at Philadelphia, the sum of five thousand dollars, to endow a professorship of the fine arts, so that the elements of drawing and sketching from nature, may form part of the course of instruction of its alumni.

"Item.—I give and bequeath to the Pennsylvania Agricultural Society, the sum of five thousand dollars in trust, to be by them applied towards the erection and support of an agricultural college within the said state.

"Item.—I give and bequeath the sum of one thousand dollars each to the following institutions, viz. (all of Philadelphia)—

"Refuge for decayed merchants    .    .    .    $1000."

The auditor appointed to audit, settle, and adjust the accounts of the executors of the testator, and also to report specially to the court, who are the persons entitled to receive each respective legacy under said will, and what amount shall be paid on each legacy, made the following report on the subject of these bequests.

"We pass now to the legacies whose validity was disputed in behalf of the executors, or of the residuary legatees, and of these the first in order is the following:—'Item. I give and bequeath to the Mayor and Councils of Philadelphia, the sum of five thousand dollars, in trust, as a perpetual fund, the income from which, I desire shall be annually for ever expended in planting and renewing shade trees, especially in situations now exposing my fellow-citizens to the heat of the sun, desiring that due care be taken to select the best varieties of fine trees, and excluding such foreign trash as the Lombardy poplar, ailanthus, paper mulberry and similar exotics.'

"It was objected to this legacy that it was not for charitable uses or purposes; that it was void for uncertainty in not designating where the trees were to be planted; that the city had no authority by law to plant the trees in the footwalks opposite the dwellings, and that the public squares were not mentioned as the places in which they were to be planted.

"Although in one sense, the legacy in question may not be

deemed for a charitable use, yet the auditor is of opinion that it is within the legal scope and operation of a disposition to charitable uses. The preamble of the statute of 43 Elizabeth, c. 4, 'whose essential provisions have been assumed here. as a part of our law,' (Pickering v. Shotwell, 10 *Barr* 26; Zimmerman v. Anders, 6 *W. & S.* 220,) enumerates among other recognised charities the repair of bridges, ports, havens, causeways, churches, seabanks, and highways. Mr. Roper says that 'gifts for promoting public works for the convenience or benefit of the public, or of the inhabitants of a particular place, are considered as charitable uses:' 2 *Roper on Legacies* 101. He refers, in the same passage, to authorities where a gift for the improvement of the city of Bath; a sum of money to be applied in forming works for supplying the inhabitants of Chepstow with spring-water from St. Arvons or elsewhere; and for the support of a botanical garden at Stockwell, were respectively sustained. In Thomas v. Ellmaker, 1 *Parsons* 98, an unincorporated fire company was held to be a charity, and authorities, both English and Pennsylvanian, are cited, fully sustaining the proposition that all cases where funds are supplied for legal, general, or public purposes, which are of a public nature, tending to the relief of the public at large, are charities. See also Blenon's Estate, *Bright. Rep.* 338. The purpose of Mr. Cresson's legacy is germain to the objects of the corporation as a municipal corporation, and in Vidal v. The City, 2 *Howard* 189, the court say, 'if the purpose of the trust be germain to the objects of the incorporation, if they relate to matters which will promote, aid, and perfect those objects, if they tend (as the charter of the city of Philadelphia expresses it) to the suppression of vice and immorality, to the advancement of the public health and order, and to the promotion of trade, industry, and happiness, where is the law to be found which prohibits the corporation from taking the devise upon such trusts, in a state where the statutes of mortmain do not exist, the corporation itself having a legal capacity to take the estate as well by devise as otherwise?" In the same opinion, the court include within these trusts, purposes confessedly charitable and beneficial to the city or the public.

" The subject-matter of this legacy must therefore be considered as falling within the scope of a charitable use as thus defined or illustrated, and there is no question but that the city is competent to take as a trustee.

" But it is also objected, that the legacy is void, both because it is uncertain where the trees are to be planted, and also because it is incapable of being executed for the reasons that the city has no legal right to plant trees compulsorily on a sidewalk, the fee in the soil thereof not being vested in the city, but in the adjacent owners, and the planting of trees not being incident to any easement which the public have in the soil. Reference was made to 2

*Roper on Legacies* 179, and, in support of the latter branch of this objection, to Lewis *v.* Jones, 1 *Barr* 336, and Sanderson *v.* Haverstick, 8 *Barr* 294, and they with other authorities do establish, for some purposes, the rule as contended for. On the other hand, it was contended, by the counsel for the city, that the city lots were originally patented by numbers and with determinate boundaries, that the fee of the streets was in the Commonwealth, that the municipal corporation has a right, by its delegated authority from the Commonwealth, and is empowered by common law in Pennsylvania, to use, control, and regulate the streets for public purposes generally, and that the planting of shade trees is a proper exercise of such use and control for public convenience. In support of this view were cited Commonwealth *v.* Alburger, 1 *Wh.* 669; The case of The Trenton Railroad Company, 6 *Wh.* 25; Rung *v.* Shoenberger, 2 *Watts* 23, and Wartman *v.* The City of Philadelphia.

"It hardly seems necessary to decide whether the corporation has a legal right to plant shade trees in the streets generally. There is nothing in the language of the legacy which limits the application of the fund to the streets or highways. There are public squares, public buildings, and other public property belonging to the corporation, in connexion with which this trust may be fulfilled. As the gift is to a municipal corporation, it must be taken as implied, that the money is to be expended within its territorial limits, and within those limits a discretion is left to the trustee which may be exercised without illegal encroachment upon the highways. Where trustees have a discretion to apply the benefits of a charitable testamentary gift, either in a way which the law allows, or which the law disallows, the presumption is that they will act in a lawful manner: Faversham *v.* Ryder, 27 *Eng. Law & Eq. Rep.* 367. A court 'will not let a charitable bequest fail where there is a discretion or option given to the trustee, and if he cannot apply it to all the contemplated objects it will be sufficient if he can apply it to any of them:' Pickering *v.* Shotwell, 10 *Barr* 28.

"The will of Mr. Cresson was dated September 3d 1853, before the recent Act of January 31st 1854, incorporating 'The City of Philadelphia.' The variance between the style of the corporation as employed in the will, and the former corporate name, seems immaterial, as well upon general principles, as by the case of the Mayor, &c. *v.* Elliott, 3 *Rawle* 170.

"The city having, therefore, a capacity to take as a trustee, and it being implied from the character of the trustee, as a municipal corporation, that the trust is to be fulfilled within its corporate limits, and there being public property within those limits in connexion with which it may be exercised, the auditor is led to the opinion that it is not void or illegal, and, therefore, awards the

[Cresson's Appeal.]

amount of the legacy to 'The City of Philadelphia,' as the present legal representative of the former corporation styled 'The Mayor, Alderman, and Citizens of Philadelphia.'

"The next in order of the disputed legacies, is the following, viz.: 'Item. I give and bequeath to the Pennsylvania University, at Philadelphia, the sum of $5000 to endow a professorship of the fine arts, so that the elements of drawing and sketching from nature may form part of the course of instruction of its alumni.'

"This legacy was claimed by the University of Pennsylvania. It appears from the minutes of the board of trustees of that institution, which were submitted to the auditor, that there is established, in connexion therewith, a department of mines, arts, and manufactures, and that by a resolution of the board, passed February 5th 1856, the organization of this department was modified, and 'a professorship of the fine arts' was constituted, 'embracing the elements of drawing and sketching from nature, and their application to practical art;' so that the corporation appears to have made provision for the execution of the trust, if that is to be regarded as a condition precedent to the vesting of the right to the legacy, though the contrary doctrine is held in Newell's Appeal, 12 *Harris* 199. It may be added that at a meeting of the board of trustees, held June 5th 1855, that body expressed by a resolution their desire 'to carry out the views of the testator in good faith.'

"It was objected, that it was uncertain whether any of the alumni of the institution would return to receive the new course of instruction; but the word 'alumni,' seems to be used in the will as referring rather to those who are to become graduates, than to those who have become such.

"The auditor can see no valid objection to this legacy, and he accordingly awards the amount thereof, for the purpose therein mentioned, to the trustees of the University of Pennsylvania.

"The next in order of the contested legacies, is the following, viz.: 'I give and bequeath to the Pennsylvania Agricultural Society, the sum of $5000, in trust to be by them applied towards the erection and support of an agricultural college within the said state.'

"This legacy was claimed by 'The Pennsylvania State Agricultural Society,' which was incorporated by Act of Assembly, March 29th 1851, *Pamphlet Laws* 1851, p. 289. The claimant gave in evidence, under objection by the counsel for the executors, a volume entitled 'First Annual Report of the Pennsylvania State Agricultural Society,' published by the legislature of this state at Harrisburg in 1854, on the back of which were printed the words 'Pennsylvania Agricultural Society,' vol. i. Also a volume entitled the 'Second Annual Report of the Pennsylvania State Agricultural Society,' published at Harrisburg in

1855. Also a newspaper published at Harrisburg, dated October 2d 1855, in which the Pennsylvania State Agricultural Society was spoken of as the 'Pennsylvania Agricultural Society.' Also an Agricultural Magazine, entitled the 'Pennsylvania Farm Journal,' for October 1854, for November 1854, and for November 1855.

"The ground on which the case of the claimant was rested, was that 'The Pennsylvania State Agricultural Society' was popularly and generally known and designated as the Pennsylvania Agricultural Society, and was therefore to be presumed to be the one intended by the testator. In support of this allegation, witnesses were produced, viz., James Gowen, Alfred L. Elwyn, M. D., Paschall Morris, Algernon S. Roberts, Andrew M. Spangler, Samuel Emlen, and John L. Pomeroy.

"Dr. Elwyn testifies that from the date of its organization down to the present time, the Pennsylvania State Agricultural Society, except where it is necessary to distinguish it from a local society, is almost universally known as the Pennsylvania Agricultural Society, and so called. Paschall Morris identifies a copy of the Pennsylvania Farm Journal for November 1852, in which the Pennsylvania State Agricultural Society is styled the Pennsylvania Agricultural Society, and says he has frequently so styled it himself. Algernon S. Roberts, who has known of the existence of the Pennsylvania State Agricultural Society from its organization, testifies that Pennsylvania Agricultural Society is a popular name for it; that he has very frequently heard it so styled, more frequently than otherwise; and that the word 'State' is more frequently omitted than used. He also identifies the February number of the Pennsylvania Farm Journal for the year 1853, in which the proceedings of the Pennsylvania State Agricultural Society are spoken of as those of the Pennsylvania Agricultural Society. Andrew M. Spangler, who says he has been connected with the Pennsylvania State Agricultural Society ever since its organization, testifies that Pennsylvania Agricultural Society is a popular name for that society; that he had heard it used very frequently, and used it himself. Samuel Emlen, and John L. Pomeroy, whose acquaintance with agricultural matters does not, however, extend much, if any, beyond 1854, testify that Pennsylvania Agricultural Society is a popular name for the Pennsylvania State Agricultural Society, and one of them says he has known it by its popular name as often as by any other name.

"Taking this positive parol evidence by itself, and there is no other to contradict it, or viewing it in connexion with the printed matter, consisting of books, magazines, and newspapers, commencing as to time of publication, at a period anterior to the making of the will, and coming down to the present, it must be considered as making out the fact that the Pennsylvania State Agricultural Society has from its organization been popularly

known and designated as the Pennsylvania Agricultural Society. There is no evidence that any other society has ever been so known or designated; no other society claims the legacy, and it is testified that the establishment of an agricultural college was a favourite notion of this society, and had frequently been discussed before it.

"It appears from the evidence of Mr. Coppinger, one of the executors (whose evidence, though objected to, was received, as the estate is believed to be adequate to pay the legacies, and he does not appear to have any direct legal interest in the result of the inquiry), that the testator was for several months before his death a member of 'The Philadelphia Society for promoting Agriculture,' existing within this county, and that once at least he attended its meetings, but there is no evidence that this society was ever known as the Pennsylvania Agricultural Society. In Tucker *v.* Seamen's Aid Society, 7 *Metc.* 188, the circumstance that the testator was a contributor to one society was not deemed sufficient to defeat a claim made by another under somewhat similar circumstances with the present case, and as the testator by his membership in the one society might be supposed to have become familiar with its name, he would doubtless have been more able to identify it had he intended to refer to it. Mr. Coppinger supposes the testator meant to refer to the Philadelphia Society for Promoting Agriculture, and even if his opinion were legal evidence, it seems to be founded solely on the fact of the testator's membership.

"Besides, it is to be observed, that the legacy is 'for the erection and support of an agricultural college within the state,' and although a college established by a local county society within the limits of this county would be within the state, yet as the will appears to leave it optional with the legatee to establish it elsewhere within the state, it would be more natural to suppose that the trust was intended to be committed to a state society, whose operations extended throughout the entire state.

"The designation employed by the testator is identical, as far as it goes, with the corporate title of the claimant; the variance consists only in the omission of a single term from the full style, and this is consistent with the popular tendency to abbreviate such proper names. In this will corporate titles are not generally employed with accuracy. It was contended, that there was no evidence to show that the testator had ever known or spoken of the Pennsylvania State Agricultural Society as the Pennsylvania Agricultural Society. But the authorities do not appear to make this a criterion in such cases. In Newell's Appeal, decided last year by our Supreme Court (12 *Harris* 199), it is said to be enough to show that the corporation claimant is generally known by the designation employed by the testator, and that there is no other body answering the description in the will. The misnomer in that

case was more variant from the corporate style than in the present. It does not seem necessary to refer to the numerous authorities on this subject, though most of them were cited on the argument, for the rule thus laid down so recently by our Supreme Court must be considered as governing.

"The auditor is of opinion, that the claimant has made out a case within the rule, and he therefore awards the legacy in question to the Pennsylvania State Agricultural Society, to be applied to the purposes mentioned by the testator.

"The next matter to be considered arises upon the following provision in the will, viz. :—' Item : I give and bequeath the sum of one thousand dollars each to the following institutions, viz. (all of Philadelphia') : then several institutions are enumerated, among which is,

'Refuge for Decayed Merchants,    .    .    .    $1000.'

"This legacy was claimed by a society incorporated by the state of Pennsylvania, January 28th 1854, by the style of 'The Merchants' Fund,' whose object, as stated in the charter, hereto annexed, together with the by-laws, is 'to furnish relief to indigent merchants of the city of Philadelphia, especially such as are aged and infirm.' A large amount of evidence was taken in support of this claim, the relevancy and admissibility of all of which was objected to.

"The leading facts connected with this claim are as follows :— In November 1851, at a meeting of a society established in this city, known as the Mercantile Beneficial Association, a resolution was passed to the effect 'that the board of managers be requested to lay before the next annual meeting the outline of a plan by which a trust fund may be established, with a view to founding a home for decayed merchants and clerks, if, in their opinion, such an idea be at all feasible.'

"Accordingly, the board of managers, at the following annual meeting, held November 9th 1852, made a report to the association, and on the 15th of the same month, the subject was referred by the board of managers to a special committee, who, on the 13th of the following December, made a report to the board, concluding with a resolution, 'that it is the wish of the board that every suitable effort should be made to create a fund for the support of decayed merchants, in accordance with the views of the committee appointed for taking this matter under consideration,' and a resolution was also offered that a committee of gentlemen from the mercantile community be requested to attend a meeting for final action on the subject. Both of these resolutions were adopted by the board, and invitations were accordingly extended to twenty-five prominent merchants of the city to join in the meeting. In pursuance thereof, the meeting was held some time prior to January 10th 1853, at the hall of the Mercantile Beneficial Associa-

tion, at the corner of Tenth and Filbert streets, Philadelphia. Mr. Cresson, the testator, was among the persons invited to be present, and he attended and delivered an address in advocacy of the proposed objects, and, as several of the witnesses say, promised it material aid. A committee was appointed from among the persons present, upon which Mr. Cresson was placed as a member. Frequent meetings of the committee were held, and the whole subject was intrusted to their consideration. The movement at last became disconnected from the Mercantile Beneficial Association, under whose auspices it had originated, and on April 4th 1853, a meeting for definite organization as a separate body, was called at the room of the Board of Trade in the Merchants' Exchange, Philadelphia, at which officers were chosen, Mr. Cresson being constituted a member of the board of managers; and the new society was then denominated 'The Merchants' Fund.' This meeting, it will be seen, was about five months before the date of the will. Afterwards, on the 28th of January 1854, about three weeks before the death of the testator, the society became incorporated by that name.

"Now it is contended in behalf of the claimant, that from the inception of this enterprise, or its proposal in 1851, down to the said meeting for organization at the Philadelphia Exchange, the association was generally known or denominated as an Institution, or Refuge, or Asylum, for Decayed Merchants, and that the name was changed to that of 'The Merchants' Fund' at the meeting just mentioned, because the former name was by some of the members deemed objectionable.

"Let us, in the first place, examine whether this allegation is sustained by the evidence.

"The minute book of the board of managers of the Mercantile Beneficial Association, with another of its books termed the journal, and the minute book of the board of managers of 'The Merchants' Fund,' and the minute book of the society itself, were produced by the respective secretaries of those societies. In these books the preliminary proceedings above mentioned are quite fully set forth. Extracts from them have been furnished to be hereunto annexed. The special committee of the board of managers of the Mercantile Beneficial Association is therein spoken of as the 'Committee on Decayed Merchants.' William A. Rolin, Thomas F. Brady, John W. Claghorn, Charles S. Ogden, A. Theodore Churr, and William H. Bacon, were examined in support of the claim, their evidence and that of the books above mentioned being objected to as irrelevant and inadmissible.

"Mr. Rolin testifies that he took part in the organization of 'The Merchants' Fund;' that Mr. Cresson was present at a meeting of merchants called to consider the formation of a Refuge for Decayed Merchants, at the corner of Tenth and Filbert streets,

and made a long speech there in its favour, and promised it his aid; he further says, 'The Merchants' Fund was known previous to its act of incorporation, and previous to a meeting of the association held at the Merchants' Exchange, as the Refuge for Decayed Merchants. I don't often hear of it outside, but its common designation, among the board of managers of the Mercantile Beneficial Association, is the Refuge for Decayed Merchants.' Mr. Brady says that all notices addressed to the members of the committee (of which Mr. Cresson was a member), appointed at the meeting at the corner of Tenth and Filbert streets, 'asked their attendance to a meeting on decayed merchants; the notices were sent in that way to the members. I do not know that Mr. Cresson ever received such notice, but presume he did, as he was a member of the committee; that up to the time of the meeting at the Merchants' Exchange, it was known only as the Society for Decayed Merchants; sometimes, but not so frequently, using the term 'Refuge for Decayed Merchants.' He further says, 'it was at the meeting at the Merchants' Exchange the title was changed to Merchants' Fund.'

"John W. Claghorn proves Mr. Cresson's presence at the meeting at the corner of Tenth and Filbert streets, his expression of deep interest in the establishment of such an institution, and his intimation of an intention to leave a large sum for that purpose. Charles S. Ogden testifies to some of the same facts. He further says, 'the name by which we knew the institution at our meetings was as the Asylum for Decayed Merchants. It was variously spoken of in that way.' Witness also states, that in a conversation with Mr. Cresson after the incorporation of the Merchants' Fund, and four or five weeks before Mr. Cresson's death, the subject was introduced, and he (the witness) 'spoke of it as our Decayed Merchants' Institution;' that Mr. Cresson understood him to refer to the Merchants' Fund, and made reply that it was a worthy object. Furthermore, that the Merchants' Fund 'was known by the designation of Refuge for Decayed Merchants; it was spoken of as a fund created for the benefit of decayed merchants.'

"A. Theodore Churr testifies, that 'The Merchants' Fund' has been and is occasionally called the Refuge or Society for Decayed Merchants; that during the period from the time of its organization, down to the date of its incorporation, 'it was called the Asylum or Refuge for Decayed Merchants;' witness also says, that in an article which he prepared at the request of the president of the Mercantile Beneficial Association, and which was read before the annual meeting of that body, he called it by the name of an Asylum for Decayed Merchants at that time, and ever afterwards, up to the incorporation of the Merchants' Fund, and frequently since then by the old name.

" William H. Bacon testifies to some of the same facts, and says further that the society ' was called the Asylum for Decayed Merchants, and was altered at a meeting held at the Philadelphia Exchange, by William C. Ludwig, who offered the resolution, and the name was then changed to that of The Merchants' Fund.' On cross-examination witness says, ' Having taken an active interest in its organization, I do positively assert that it was known originally and very generally by those who were interested in its organization, as the Asylum for Decayed Merchants; that its name was discussed by and approved by Mr. Cresson at the meeting alluded to, where he was present;' and again, ' from the first proposition of its establishment, in the latter part of 1852, until early in the year 1854, or perhaps I may say until its incorporation,' it was known by the name of the Asylum for Decayed Merchants.

" It was contended by the counsel for the executors and for residuary legatees, that this legacy should go to the fund referred to in the second item of the will (which was, for the foundation of a home for aged, infirm, or invalid gentlemen and merchants), and that there was at least nothing in the language of the legacy to identify the Merchants' Fund as the legatee. The testator, in several parts of his will, and in different language, has designated two objects of his bounty, without anything appearing in his language to show that they are necessarily to be connected together, or that the latter legacy is merely cumulative to the former. It seems impossible, upon this state of facts, in the absence of any plain indication to that effect, to suppose that both provisions were intended to apply to one and the same object.

" The main inquiry is, therefore, whether the claimant is sufficiently identified as the testator's intended beneficiary.

" This institution was incorporated January 28th 1854, after the date of the will, which was October 7th 1853, and before the testator's death, which took place February 20th 1854. It is not believed, however, that the fact of incorporation at any particular time, or at any time, is material, as far as the mere legal capacity to take is concerned. The question is one of identification. The evidence upon that subject shows that from the inception of the plan down to the time of the meeting at the Merchants' Exchange, it was called and known indifferently as the Refuge for Decayed Merchants, or Asylum for Decayed Merchants, or the Institution or Society for Decayed Merchants. The peculiar expression ' Decayed Merchants,' appears to have formed the principal feature or fixed element in the name, while the term prefixed thereto was variable. This indeterminateness of one of the words employed in the designation, is doubtless explained by the fact that while the subject remained for consideration and settlement, in the hands of the committee appointed at the meeting at the cor-

ner of Tenth and Filbert streets, the plan was undigested, and not fully matured, and that no final definite organization took place by officers, or by determinate title, until the meeting at the Philadelphia Exchange, when the present name was adopted.

" The testator is shown to have taken an active part at the first meeting held on the subject; he was a member of a committee appointed at that meeting, and having the matter in charge, whose notices, when addressed to its members, asked their attendance to a meeting on decayed merchants; the society was spoken of in his presence as the Decayed Merchants' Institution; and it is testified that he promised to be a benefactor of it. True, it is said he was chagrined at not having been elected its president, but while this might account for a seeming disproportion between the amount of his legacy and the liberality of his professions, yet it does not appear to have been of such character as would lead to an entire revulsion of his feelings, for he spoke favourably of the society a short time before his decease. Besides, there is no other claimant, and there is no evidence of the existence of any other society with a corresponding name, or with similar objects. All that the testator has done is to use a name by which the voluntary association was known prior to its final organization, and which did not, upon the happening of that event, fall immediately into disuse. Indeed, such a result could hardly have been expected, for familiar and accustomed designations can seldom be changed instantaneously.

" The auditor is of opinion, upon the whole evidence, and according to the principles stated in a foregoing part of this report, that the claimant is sufficiently identified, as the legatee intended, by the clause in question, and he therefore awards the amount of this legacy to ' The Merchants' Fund.' "

To the allowance of these bequests, exceptions were filed by the residuary legatees, which, after argument, were dismissed, and distribution was decreed according to the report of the auditor. From this decree the residuary legatees took the present appeal.

*St. G. T. Campbell* and *Parsons*, for the appellants.—It is not disputed, at this time, but that the City of Philadelphia, in its corporate capacity, can take a legacy, or one in trust; but it is contended, first, that this bequest is void for uncertainty, and, secondly, that it is not a charity: 1 *Powell on Devises* 348; Peck *v.* Halsey, 2 *P. Wms.* 387; Mohun *v.* Mohun, 1 *Swanst.* 201; Wynne *v.* Hawkins, 1 *Br. Ch.* 179. Wherever a legacy has been held good, in Pennsylvania, on the ground of *charity*, the bequests have been for the support of religion, morals, or education: Witman *v.* Lex, 17 *S. & R.* 88; McGirr *v.* Aaron, 1 *Penn. R.* 49; Mayor *v.* Elliott, 3 *Rawle* 170; Kirk *v.* King, 3 *Barr* 436;

Zimmerman v. Anders, 6 *W. & S.* 218; Beaver v. Filson, 8 *Barr* 327; Martin v. McCord, 5 *Watts* 494; Grandom's Estate, 6 *W. & S.* 531; Wright v. Linn, 9 *Barr* 433; Pickering v. Shotwell, 10 *Barr* 23.

The legacy to the Pennsylvania University to endow a professorship of the fine arts, ought not to have been allowed. This institution had no such professorship, nor have they any now. The case of Newell's Appeal, 12 *Harris* 199, is distinguishable from the present in this particular. There are residuary legatees who will take the property in case the condition cannot be performed, or in case it does not vest.

There was no *legal* evidence that the Pennsylvania State Agricultural Society was entitled to the legacy given to the Pennsylvania Agricultural Society, and it ought not to have been allowed: 1 *Roper* 131-9; Standen v. Standen, 2 *Ves.* 589; Newell's Appeal, 12 *Harris* 199. Nor was there a particle of evidence that the Merchants' Fund was entitled to the legacy given to the Refuge for Decayed Merchants. No such body existed when the bequest was made. The bequest is void for uncertainty: 1 *Powell on Devises* 348.

*W. L. Hirst* and *G. L. Ashmead*, for the City of Philadelphia. —The bequest to the city is as clear, distinct, and positive as language can make it; the duty of the trustee is plain, and can be readily performed: Faversham v. Ryder, 27 *Eng. L. & Eq.* 367; Pickering v. Shotwell, 10 *Barr* 28. The city authorities may plant shade trees in the streets: Commonwealth v. Alburger, 1 *Wh.* 469; Case of the Philadelphia and Trenton Railroad Co., 6 *Wh.* 25; Rung v. Shoneberger, 2 *Watts* 23; Wartman v. The City, *Pamph.*

This is a charitable use: *Ward on Legacies* 90; 9 *Ves.* 405; 1 *Swanst.* 297, 308; Havre v. Chapman, 4 *Ves.* 542; Magill v. Brown, *Brightly* 346; Witman v. Lex, 17 *S. & R.* 88; Pickering v. Shotwell, 10 *Barr* 26; Zimmerman v. Anders, 6 *W. & S.* 220; Vidal v. Philadelphia, 2 *How.* 189; Blenon's Estate, *Brightly* 338.

*C. K. Biddle*, for the University of Pennsylvania.—The provision for the establishment of a professorship of fine arts, is a condition subsequent. The estate, therefore, vested in the trustees, whether such professorship had been established, or not: 2 *Bos. & Pul.* 299; 4 *Kent Com.* 125; Finlay v. King's Lessee, 3 *Pet.* 375; Newell's Appeal, 12 *Harris* 199.

*J. E. Gowen*, for The Pennsylvania State Agricultural Society. —The claimant of a legacy must necessarily prove by extrinsic evidence, that the description of the legatee applies to himself:

[Cresson's Appeal.]

Tucker *v.* Seamen's Aid Society, 7 *Met.* 188; Newell's Appeal, 12 *Harris* 197.

*Gerhard,* for the Merchants' Fund.—It is not necessary that the body to take should have been *in esse* at the date of the will: Newell's Appeal, 12 *Harris* 199; Witman *v.* Lex, 17 *S. & R.* 91; McGirr *v.* Aaron, 1 *Penn. R.* 51; Church *v.* Remington, 1 *Watts* 223; Beaver *v.* Filson, 8 *Barr* 327; Pickering *v.* Shotwell, 10 *Barr* 23; Zimmerman *v.* Anders, 5 *W. & S.* 218; Hillyard *v.* Miller, 10 *Barr* 335; Martin *v.* McCord, 5 *Watts* 493; Kirk *v.* King, 3 *Barr* 436; Wright *v.* Linn, 9 *Barr* 433; and see also Magill *v.* Brown, *Brightly* 409; Morrison *v.* Beirer, 2 *W. & S.* 81; Thomas *v.* Ellmaker, 1 *Pars.* 108; Flaherty's Estate, 2 *Id.* 186; Ayres *v.* Trustees M. E. Church, 3 *Sandf. S. C.* 351; Chittenden *v.* Chittenden, 1 *Am. Law Reg.* 538; Green *v.* Allen, 5 *Humph. R.* 170; Gallego's Ex'rs. *v.* Att. General, 3 *Leigh's R.* 450.

The opinion of the court was delivered by

STRONG, J.—We perceive, in the reasons assigned by the appellants, no sufficient warrant for disturbing the decree of the Orphans' Court confirming the report of the auditor.

The legacy to the mayor and councils of Philadelphia is assailed, not because the city is incapable of taking or holding as a trustee, but because the bequest is alleged to be too uncertain, and not a charity. If it be a charity, then, as has been shown in the appeal of The Domestic and Foreign Missionary Society, decided at this term, it is not void, because the objects are vague and uncertain, there being a trustee clothed with discretionary power over the disbursement. Is it then a charity, such as to bring it within the peculiar rules applied to charitable bequests? It is a legacy in trust for planting and renewing shade trees, especially in situations now exposing the testator's fellow-citizens to the heat of the sun.

Charity has been defined to be a general public use: *Amb.* 651. In order to ascertain what are charitable uses, the English courts have generally resorted to the preamble of the Act of Parliament, 43d Elizabeth. That act enumerates twenty-one, and among them are found the following: Repairs of bridges; repairs of ports and havens; repairs of causies; repairs of seabanks; repairs of highways; fitting out soldiers—other taxes. And beyond the enumeration contained in that act, many other gifts have been recognised at common law as gifts to charitable uses, for example: for cleansing the streets, maintenance of houses of correction; for the true labour and exercise of husbandry; for public benefit. These cases, and many others, are collected in Magill *v.* Brown, *Bright.* 347. It is true, the statute of Elizabeth is not in force as a statute in Pennsylvania, but its principles are a part of our

common law. The case of Magill v. Brown was a Pennsylvania case, and there it was held that a bequest for a fire engine and hose was a gift for a charitable use. In 7 *Johns. Ch.* 292, the same was ruled of a legacy for erecting a town-house. It cannot be doubted that the bequest in Mr. Cresson's will to the mayor and councils is equally for a charitable use.

The foregoing observations are also applicable to the legacy to the University of Pennsylvania, and are decisive.

It is next contended that The Pennsylvania State Agricultural Society is not a legatee intended by the testator. The legacy is to The Pennsylvania Agricultural Society. We are of opinion that it has been allowed to the right claimant. This part of the case is ruled by Newell's Appeal, 12 *Harris* 199.

The auditor's report so satisfactorily establishes the propriety of the award to the "Merchants' Fund," that we deem it needless to say more than to avow our concurrence with the views therein expressed.

Decree of the Orphans' Court affirmed, with costs.