## WRIGHT v. LINN.

Where land was conveyed to trustees and their successors, to erect a school-house for the perpetual use of the parties to the deed and the inhabitants residing nearer to that school than any other, and such other persons as the inhabitants might see fit to admit, a charity is created which is not divested by non-user for more than seventeen years after a school-house had been erected by contribution and used, and a re-entry by the grantor.

Permanency is not essential to constitute a charitable gift.

In error from the Common Pleas of Bucks.

*Dec. 27.* Ejectment. In 1812, Samuel Wright conveyed the land in question in this suit to Williamson et al., *and their successors,* in trust that they and others concerned should build a schoolhouse thereon, which should be open and free, not only for the grantees, but also for the grantor, and all other civil and well-disposed inhabitants who might for the time being reside nearer thereto than to any other public school, and for such others as the inhabitants might see fit to admit, and to the intent that the said lot of ground might be faithfully appropriated to the use of a public school, for the benefit of the surrounding neighbourhood, not only during the present generation, but to continue in perpetual succession for ever.

The consideration mentioned, was "the benefit of a school-house being erected in the neighbourhood, and divers other good causes

and *valuable* considerations;" and one dollar. A school-house was then erected by contribution of neighbours, at a cost of $160.

A school was kept there until some time between 1822 and 1826, when another school-house being erected in the neighbourhood, it was abandoned for that purpose, and had since been occupied by strangers. In 1840–1, the grantor re-entered. Subsequently the defendant occupied it as a paint-shop. In 1843, the original grantor conveyed to the plaintiff, who brought this action.

Whether the grantees were living did not appear; and it will be observed a life-estate only passed to them, under the rule of Methodist Ch. *v.* Remington, 1 Watts, 218.

KRAUSE, P. J., directed a verdict for defendants, saying this was a charity, and not to be defeated by non-execution by the trustees, or the omission of the *cestuis que use* to compel them to their duty.

*Wright*, for plaintiff in error.—Martin *v.* McCord is overruled by Kirk *v.* King, 3 Barr, 436, which is precisely similar both in the grant, and the facts connected with the abandonment.

*Ross*, contrà.—It is proper to state that the defence is taken by the school directors of the district, for whom I appear, though they are not on the record. The act of Assembly, allowing a conveyance of these buildings to them, treats them as permanent charities. In this case there is a legal title in the trustees, and Martin *v.* McCord, 5 W. 493, is directly in point.

*Jan.* 20. BELL, J.—Upon the authority of *Martin v. McCord*, 5 W. 493, the learned judge before whom this cause was tried, instructed the jury that the conveyance of the 14th of December, 1812, did not create a conditional estate, but established a trust for a charitable use, not liable to be defeated by *non-user*. The object of that conveyance was the foundation of a public school, for the benefit of the inhabitants residing in its neighbourhood. Such a school is certainly treated by the case cited as being included in the class of charities, recognised by our law as entitled to especial protection, and not subject to be destroyed by a perversion of the trust, or the neglect and refusal of the trustees to give it effect. Then came the determination in Kirk *v.* King, 3 Barr, 436, which is thought to establish a contrary doctrine.

It is truly said, in the first of these cases, that these neighbourhood schools have been favourably known in Pennsylvania, since a

period shortly posterior to the arrival of William Penn in the province. The facilities they afford for the education of the young, in rural districts, remote from the higher seminaries of learning, recommended them to the acceptance of the people; and they have accordingly grown to be numerous with the advancing population of the country, and proved to be of great utility. A regard for the settled policy of the state, which seeks to promote the education of all her citizens, would seem, therefore, to dictate the propriety of sustaining these humble but useful institutions, whenever this can be accomplished without a violation of settled legal principles. Whether they are within the protecting supervision of our courts, in the exercise of an equitable jurisdiction, is the question presented here. I regard it as an important one.

Though the stat. 43 Eliz. ch. 4, relating to charitable uses, has not in terms been recognised as extending to Pennsylvania, we have adopted not only the principles that properly emanate from it, but, with perhaps the single exception of *cy pres*, those which, by an exceedingly liberal construction, the English courts have engrafted upon it. The peculiar equities commonly ascribed to its operation are freely administered here, wherever our means are found adequate to the purpose; and, in this respect, our competency has been much enlarged by the laws extending the equitable powers of our tribunals. In Witman *v.* Lex, 17 S. & R. 88, it is observed, that as the jurisdiction of our courts is not founded on the statute, it is not restrained to the cases specially enumerated in the preamble. The same remark is almost equally true in England. There, the equity of the act has been extended to embrace a large variety of subjects, by analogy to those enumerated, until the limits of the circle have swelled far beyond the bounds prescribed by the language of the enactment. Indeed, it is now asserted to be merely directory, since, as is said, the jurisdiction existed long before. The fashion has everywhere been to enlarge, but never to circumscribe the operation of the statute. It therefore furnishes in both countries an unerring test of the character to be ascribed to those subjects and objects of which it specially speaks. Each of these may be safely ranked as a technical charity, and, as such, entitled to the overshadowing protection and fostering care of chancery. When we recur to the zeal for learning which marked, in a peculiar manner, the epoch of the statute, we are not surprised to find named among the objects deemed worthy of special care and superintendence, donations to found or assist " schools of learning, free schools, and scholars in universities." These are

classed with gifts for the relief of aged, impotent, and poor people —the maintenance of sick and maimed soldiers and mariners, and other like benevolences. In connexion with these, the special remedy provided touches the abuses, breaches of trust, negligencies, misemployment, *not employing*, &c., of any lands, tenements, rents, &c., theretofore, or which might thereafter be given, limited, appointed, or assigned "to or for any of the charitable and godly uses before rehearsed."

Some difficulty seems, at one time, to have been experienced as to what species of school was intended, and at first it was thought that only free schools were comprehended: Atty. Gen. *v.* Hewer, 2 Vern. 387. But this notion has been repudiated since the judgment pronounced by Sir John Leech, in Atty. Gen. *v.* Lonsdale, 1 Sim. 109, that the institution of schools for the sons of gentlemen, though not in popular language a charity, is yet, in *common with all schools of learning*, so to be considered in view of the statute. Several decisions have also settled that universities and colleges are within the benefit of the statute for the protection of gifts made to them: Flood's Case, Hob. 136; Plate *v.* St. Johns, Duke by Bridg. 379; King *v.* Newman, 1 Lev. 284; Atty. Gen. *v.* Downing, Wilm. Op. and Judg. 14. It may, therefore, be taken as settled in England, that every school of public instruction, of whatever grade, is embraced within the notion of a charity. With us, who profess to estimate general education as of the last importance, stringent reason exists for insisting upon this doctrine, which solely aims at the preservation and encouragement of seats of learning. Indeed, I am not aware that, rightly understood, it has ever been deliberately questioned. In Kirk *v.* King, the Chief Justice based the determination upon the ground that the school there in question lacked the quality of permanency, thought to be an essential element of a charity. "It may be true," he observed, "as was said in Martin *v.* McCord, that the courts would not let a charity fail for the *non-user* of those who have the management of it; but charities are permanent foundations, which can scarce be predicated of country schools under the voluntary system." This position, it is submitted, is hardly admissible as a proposition of universal application. Upon this head there is a want of precision and distinctness in the cases. But a careful examination of them will, I think, warrant the conclusion that a gift may be constituted a charity, either by the use of terms and expressions that leave no doubt of such an intention; and this may occur where the fund is sooner or later to be dissipated and lost by its entire distribution:

or by directing such an application of it as would be inconsistent with the notion of a mere legacy or present gift; and this is the case where the fund is of a permanent nature, or the subject it is applied to sustain partakes of that character: Boyle on Char. 37. The first of these may be denominated natural charities, deriving their complexion from the eleemosynary quality of the gift; the second, conventional charities, and depending upon positive enactment or judicial determination for their classification. Of the former description was the bequest in Atty. Gen. *v.* Bucknall, 2 Atk. 328, of a sum of money to assist the donor's "poor relations," according to B.'s directions. By force of this phrase it was treated as a charitable gift, and both principal and interest declared to be applicable. So in Mahon *v.* Savage, 1 Sch. & Lef. 111, where a testator bequeathed to his executors 1,000*l.*, to be distributed among poor relations, *or such other objects of charity* as should be mentioned in his private instructions to the executor. None such were left, but Lord Redesdale held it to be a charity, and therefore not to be confined to the donor's next of kin, for, said he, "the testator's design was to give to them as objects of charity, and not merely as relations." Another instance is furnished by Powerscourt *v.* Powerscourt, 1 Moll. 616. The devise was of an annuity of 2,000*l.*, *till the testator's son came of age*, which was to be applied "in the service of my Lord and Master, and, I trust, Redeemer." This was established as a good charitable devise. There are also cases showing that bequests to poor clergymen; to poor housekeepers; to the poor inhabitants of a parish, and to the poor generally, are all valid charitable dispositions, whether the bequest is designed for immediate distribution, or directed to be set apart as a permanent fund.

Sir Tho. Plumer, in Melick *v.* The Asylum, Jac. 180, glances at both these species of charity. He stated charitable uses to be "where the donor appropriates a gift either to *charity*, or to some public purpose, such as the repair of bridges, ports and havens, &c., not operating in any manner to the benefit of himself." The latter kind are described by Lord Camden, in Jones *v.* Williams, Amb. 651, to be a gift to a general use, which extends to the rich as well as to the poor, many instances of which are stated in the statute of Eliz., as for building bridges, supplying a town with water, &c. The definition of Sir John Leach, in the British Museum *v.* White, 2 Si. & St. 594, is still more comprehensive. He considered every gift for a public purpose, whether local or general, to be of a charitable nature, although not so within the com-

mon and narrow sense of those words. The same learned judge in another case stated it as his opinion, that "funds supplied from the gift of the crown, or from the gift of the legislature, or from private gift, for any legal, public, or general purpose, are charitable funds to be administered by courts of equity. It is not material that the particular public or general purpose is not comprised in the statute of Elizabeth, all other legal, public, or general purposes being within the equity of that statute."

From this it would seem that every kind of legal public benefaction is included in the notion of a charity. One of its qualities is generality, but this is satisfied by a comprehension of particular classes of persons or designated communities. From its nature, permanency either of the donation or its object would seem to be also requisite. Yet certainly perpetuity is not, and therefore a charity may exist consistently with an express or implied limitation. Indeed, it has been said that it is the generality of these dispositions that constitutes charities: Atty. Gen. v. Pearce, 2 Atk. 88. As instances may be given, Jones v. Williams (supra), for supplying a town with water; Howse v. Chapman, 4 Ves. 542, for the improvement of a city; and Johnson v. Swann, 3 Mad. 464, for establishing a life-boat for the use of a town. These are all cases dehors the terms of the statute, and therefore gave rise to some controversy. But here, as in England, there would seem to be no room for dispute, where the thing itself is designated by the statute, as a public charity. No one has ever dreamed of questioning the charitable character of gifts and institutions there enumerated; the only difficulty felt being in the equitable extension of the statute. Among the objects designated are, as we have seen, schools. Nor would it seem to make any difference that they are not permanently endowed, if they be designed for an existence which may be continued. The orphans' school, mentioned in Atty. Gen. v. Davies, 9 Ves. 535, and there conceded to be a charity, is noticed by Lord Eldon to be a voluntary society, existing purely by voluntary engagements and contributions. It has long been held, that money given to build or repair a church, is given to a charitable use; and surely it must be agreed that land given as the site of a public school-house, prima facie stands in the same category. It may be otherwise, where the object in the contemplation of the party is ephemeral, and the subject sought to be promoted is intended to be of temporary duration. This is the point upon which Kirk v. King was made to turn; and, where such is the case, perhaps the grant may be taken as on an implied condition of reverter,

so soon as the temporary object is accomplished. But such a condition should either expressly appear, or be unerringly indicated by the circumstances attendant on the gift. In the case just alluded to, such circumstances seem to have been found in the supposed custom and understanding of the country. But, I confess, my experience on this subject does not accord with that detailed by the Chief Justice. These grants of a small portion of land, for the purpose of founding schools, are of frequent occurrence. In the districts with which I am best acquainted, they are usually occupied by substantial and permanent erections, expressly designed for educational purposes. Though, for the most part, supported by voluntary contributions, and consequently occasionally unoccupied, they seldom cease to be regarded as the fountains from whence the youth of the neighbourhood are to derive, to some extent at least, mental nourishment. Nay, until recently, their portals presented to many the only path to rudimental knowledge; and not a few, filling respectable positions in society, point to the wayside school as the place of their early instruction. It is true, that since the introduction of the common school, under our system of general education, the other has declined in importance. But this furnishes an additional reason why the grants of land, which originated many of them, should be held inviolate; since the general school law provides for the transfer of the voluntary school-houses and the ground occupied by them, to the school directors of the proper district, to be used as district schools. In this very instance, although not shown by the record, it is understood the real contest is between the plaintiff and the common-school directors, to whom a conveyance of the house in question has been made. This is mentioned, not as a reason for the decision, but as illustrative of the argument which ascribes to the neighbourhood school the quality of permanence, at least in a sufficient degree to support its pretensions as a public charity.

But apart from this, the present is clearly distinguishable from the case of Kirk *v.* King, under the reasoning which led to that determination. Should it be even admitted that technical perpetuity is necessary to support this grant, as a donation to charitable uses, the conveyance possesses the requisite feature. It is in trust to build a school-house on the lot granted; and " to the intent that the said lot of ground may be faithfully appropriated to the use of a public school for the benefit of the surrounding neighbourhood, *not only during the present generation, but to continue in perpetual*

*succession for ever.*" This emphatic language would seem to be decisive of the question.

Before our several acts of Assembly, conferring upon our common-law tribunals some of the powers of a court of chancery, in relation to trusts, such an one as this might have been defeated by the obstinacy or neglect of those appointed to carry it into effect. But this is remedied by the conferred jurisdiction of defaulting trustees.

It has, however, been suggested, that as we have disclaimed the doctrine of *cy pres*, the charity must necessarily be defeated by a continued refusal of the neighbours to sustain the school, since the courts possess no authority to compel them to it. That such a failure may occur, even in England, is shown by Atty. Gen. *v.* Bishop of Oxford, 1 Bro. C. 444, n. But this is no reason why, in the mean time, it should not be protected as a charity. Indeed, the supposed case can rarely happen, especially since the enactment of that part of the school law to which I have referred. When, however, such an instance presents itself, it will be time enough to determine what effect it may have on the title of a permanent foundation.

It may be well enough also to observe, that this case differs from Kirk *v.* King, in another particular, upon which some stress was laid. There, the legal title remained in the original owner, the "school company" having but an equity, which was thought to be dependent on the agreement to use the ground "for an English school-house, and for no other purpose." Here, the legal title was conveyed to the trustees, who, according to the doctrine of Martin *v.* McCord, paid for it a valuable consideration, by the erection of the school-house. The grantor thus parted with his whole interest, except as an inhabitant of the neighbourhood; unless, indeed, his conveyance is to be treated as conditional. For this, I have endeavoured to show there is no pretence.

For the reasons given, the judgment rendered below must be affirmed.

It is perhaps proper to add, that in this conclusion all the members of the court concur.

Judgment affirmed.

GIBSON, C. J., was absent during the argument, but expressed his concurrence in the decision.