# FIRE INSURANCE PATROL v. JULIA F. BOYD.

ERROR TO THE COURT OF COMMON PLEAS NO. 1 OF PHILA-DELPHIA COUNTY.

Argued January 17, 1888—Decided October 1, 1888.

1. The true test of a legal public charity is the character of the object sought to be attained, the purpose to which the gift is to be applied; not the motive of the donor.

2. A corporation which in the performance of its corporate duties is acting, without gain or profit, in aid and ease of the municipal government in the preservation of life and property at fires, whether as a volunteer or not, is a public charity and not subject to the doctrine of respondeat superior.

3. The Fire Insurance Patrol of Philadelphia, incorporated by the act of April 26, 1871, P. L. 59, to save life and property in and contiguous to burning buildings, being without money capital but supported by voluntary contributions of fire insurance companies, making and dividing no profits or dividends and in saving property making no discrimination between property insured and property not insured, is a public charity and not liable for the negligence of its employees.

4. When a public corporation has no property or funds but what have been contributed for a special, charitable purpose, it would be against all law and all equity to apply the trust funds thus contributed, to compensate injuries inflicted by the negligence of its agents and servants : per Mr. Justice PAXSON.

5. At the trial of a joint action against three tort-feasors, a compulsory nonsuit was entered as to two and a verdict rendered against the other. Pending a writ of error taken by plaintiff on the order of nonsuit, the defendants paid the jury fee and had the prothonotary enter judgment

on the verdict rendered. The order of nonsuit was reversed on the writ of error, and on a second trial, had against the objection of the then defendant on the ground of the judgment already existing, there was a verdict for the plaintiff. Afterwards on motion of plaintiff's attorney a rule to strike off the first judgment was made absolute, when plaintiff paid both jury fees and had judgment entered on both verdicts: whether error, not decided.

Before GORDON, C. J., PAXSON, STERRETT, GREEN, CLARK and WILLIAMS, JJ.; TRUNKEY, J., absent.

No. 122 July Term 1887, Sup. Ct.; court below, No. 900 March Term 1883, C. P. No. 1.

On April 17, 1883, Julia F. Boyd, widow of Charles S. Boyd, deceased, and Herbert H. Boyd, son of said deceased, by B. W. Andrews, his next friend and guardian, brought an action in case against The Fire Insurance Patrol of the city of Philadelphia, and James A. Hutchinson and Andrew C. Koochogey, its employees, to recover damages for the loss sustained by the death of said Charles S. Boyd, alleged to have been caused by the negligence of the defendants. The plea was the general issue, not guilty.

At a trial on January 28, 1885, before BIDDLE, J., after the plaintiff's case in chief was closed, the court ordered a compulsory nonsuit as to The Fire Insurance Patrol and Koochogey, and the jury rendered a verdict in favor of the plaintiffs against Hutchinson, the other defendant, for $25,000. On March 28, 1885, the court refused a motion for a new trial on the part of Hutchinson, and the same day refused the plaintiffs' motion to take off the nonsuit as to the other defendants, The Fire Insurance Patrol and Koochogey. Thereupon, the plaintiffs took a writ of error to No. 36 July Term 1885. On June 12, 1885, the jury fee was paid by the defendants' counsel and the prothonotary entered judgment upon the verdict rendered against Hutchinson. On October 4, 1886, the order directing the nonsuit as to Koochogey was affirmed by this court, and that directing the nonsuit as to the Fire Insurance Patrol reversed, with a venire de novo awarded. The case is reported, sub nomine Boyd v. Insurance Patrol, 113 Pa. 269.

At the second trial, on April 25, 1887, it was made to appear in the plaintiffs' case, that there had been a fire in the store of Coon, Brother & Co., 29 South Front street. The Fire Insur-

Statement of Facts.

ance Patrol, a corporation created and sustained by the insurance companies of the city, had sent its patrolmen there, and they had used heavy tarpaulins in the fourth floor of this store. A few days after, on the afternoon of May 6, 1882, two of these patrolmen, Hutchinson and Koochogey, went with a one-horse wagon to bring the tarpaulins away. They folded them up into bundles in the fourth story. Instead of putting them on a hoist, which ran up and down a large hatchway immediately alongside, and which was worked easily by the ropes, they determined to pitch them out of the window upon the pavement. Koochogey was stationed on the pavement to give notice to passers-by, so that they might not be struck by the tarpaulins; Hutchinson remained in the fourth story to throw them out. The bundles were quite large and each weighed about fifty pounds.

A little before three o'clock in the afternoon, a Mr. Allen was passing along on the pavement, when one of the bundles was thrown out by Hutchinson, and the warning given by Koochogey so late, that the bundle came within a foot or two of Mr. Allen. A few minutes after, Charles S. Boyd came from his store, No. 19 South Front street, a few doors above Coon's store, going down Front street. He passed from the pavement to the middle of the street, as if intending to go to the west side, but when opposite the store of Young & Co., which was on the north side of an alley, six feet wide from curb to curb, Coon's store being on the south side of this alley, he veered to the east side to go on the pavement in front of Coon's store. He was very near-sighted and wore spectacles; he was walking rapidly and as he stepped on the curb of Coon's pavement, he heard a cry, "Look out!" but it came too late; a bundle of tarpaulins, thrown or pushed out of the window by Hutchinson, struck him on the back and broke his spine, and he died on the following Friday.

In the case of the then defendant, so far as necessary to be stated here, it was made to appear that the association was incorporated by the act of April 26, 1871, P. L. 59. As disclosed by the charter, the object of the corporation was "to protect and to save life and property in or contiguous to burning buildings, and to remove and take charge of such property, or any part thereof, when necessary;" and to carry this object out,

the said corporation had "power to provide suitable places for the transaction of its business, and also to provide a patrol of men and a competent person to act as superintendent, with suitable apparatus to save and preserve life or property at or after a fire; and, the better to enable them so to act with promptness and efficiency, full power was given to such superintendent and to such patrol to enter any building on fire, or which might be exposed to or in danger of damage from fire or water, and at once proceed to protect and endeavor to save the property therein, and to remove such property or any part thereof during or after such fire: nothing in this act, however, shall warrant an interference with the orders of the chief engineer of the Fire Department in reference to the action of the firemen in their duties in extinguishing a fire: Provided, That nothing therein contained shall be construed to affect or interfere with the power or duties of the officers of the Police Department of the city of Philadelphia, at fires occurring within the limits of the said city."

Evidence was introduced showing that the association was a purely voluntary association; that it had no capital stock, declared no dividends, nor did it have the means of making or dividing any profits among its members; that it was maintained by contributions or subscriptions made by a number of the insurance companies and insurance agents in the city, which were purely voluntary, there being no compulsory assessment, nor any suggestion as to the amount of contributions, nor were the contributions based upon the amount of business done by any company; that these funds and subscriptions were obtained by circulars sent out each year; that the patrol occupied a building where the chief engineer of the Fire Department made his headquarters, and had a fire engine, patrol wagons, fire extinguishers, tarpaulins and the usual accessories of a volunteer fire company; that their orders were to save all property or life in danger, and the patrol men did not know until after a fire whether there was an insurance on property saved or not; that they attended annually about eleven hundred fires, and saved uninsured property as well as that insured; and, as claimed by the defendant, there was no evidence tending to show that the contributing insurance companies were in any way benefited by the association, apart from the general public.

### Charge of Court below.

At the close of the case upon the evidence, the defendant submitted in writing twenty-six points for instructinos. The first ten of them presented, in as many shapes, the position that as a judgment had already been entered on June 12, 1885, against Hutchinson, one of the defendants, the court could not enter a second judgment in the same suit against The Fire Insurance Patrol, and the verdict should be for the defendant. The next ten points asked in as many forms the instruction that if the jury should find that the deceased was chargeable with contributory negligence, the plaintiffs were not entitled to recover. The remaining points, 21–26 inclusive, raised the question covered by the following point:

23. The defendant, The Fire Insurance Patrol of the city of Philadelphia, a corporation the object of which is to protect and save life and property in or contiguous to burning buildings, and to remove and take charge of such property or any part thereof when necessary, having been shown to have no capital stock or means or provision for making profits, and deriving its funds solely from voluntary donations, and holding them in trust for the objects named in its charter, and exercising its corporate functions exclusively for the preservation of the life and property of the public, without discrimination of individuals or property whether insured or uninsured, and without the expectation or right on the part of those mediately or immediately interested in the corporation to receive compensation for these services, is a public charitable institution, and cannot be held liable in this suit for the negligence of the employees selected by it, unless it has been shown not to have exercised due care in their selection.[30 to 35]

The court, ALLISON, P. J., after reviewing the facts disclosed by the evidence, charged the jury as follows :

The principle upon which the plaintiffs found their action is, as I have already said, the obligation of an employer to respond in damages for any injury which falls upon another person when the employee is following out the order of his employment by the person whom he is the servant of, and as whose servant at the time he is. It is in law the doctrine of respondeat superior. That is, the man who is above the employee is responsible for the torts of the person who is in his service and

employment, if that servant, whilst in the service and employment of his master or employer and in the course of that employment, acts so negligently or wrongfully as to inflict injury and damage upon another. The law says that, in such a case, the employer is responsible for the wrongful and tortious acts of the servant, and it is grounded upon that principle that this action is sought to be maintained; a principle well established in our law, and one that must be accepted by the jury as governing and controlling the right of the plaintiffs to bring this suit, and the right of the plaintiffs to recover, if they have shown to you by the evidence in the cause that the injury which was inflicted upon Mr. Boyd and resulted in his death, was the result of the careless and negligent conduct of the servants and employees of the defendant while they were acting and serving in the course of their business as the employees of the defendant.

Now, assuming the several matters to which I have referred as beyond dispute in the cause, what is the defence which the defendant sets up here to excuse it from responsibility to the claim which the plaintiffs make that it shall respond in damages, and in proper damages, for the loss which has fallen upon the plaintiffs ?

There are several technical and legal grounds which have been presented upon the propriety of the evidence, which have already been really passed upon—the question as to whether this action, having been brought against two or more tort-feasors, and a judgment having been rendered as against one, the action can be maintained against the other tort-feasor. That is, one person, sued with others or another one or with two or more others, has a judgment entered against him ; the allegation upon the part of the defendant is, that this judgment is conclusive as to the right to recover against the co-defendants. I think it is sufficient to say as to that proposition, which is embodied in quite a number of the points of the defendant which I have before me, that the Supreme Court have had that question before them, and they have sent it down to be tried again as against this very defendant, the Insurance Patrol of the city of Philadelphia. Independent of all other considerations, the fact that when this case went to the Supreme Court they affirmed the judgment that was entered as against one of

the defendants, sustained the action of the court in entering a nonsuit as to one other of the defendants, and sent the case down for trial again as to the defendant the Insurance Patrol with instructions that additional evidence should be given besides that which was given in the trial of the cause when it went up to the Supreme Court, in order to determine the character of this corporation—not only that which appeared upon the face of the charter and was disclosed by the charter, but by other evidence to show what was the true working and the real purpose and true object for which this corporation was chartered, so that the Supreme Court might pass upon the question which was raised before them, as to whether this was in truth and in fact, as it was contended, and as the court below thought, under the case as it then stood, a charity, holding that the property of a charity company could not be taken in execution to satisfy a judgment obtained against the employees of that charity—it is not necessary for us to go further upon this point of the case than to say that we are acting in obedience to and under the direction of the Supreme Court to try this case as against this Insurance Patrol, and we are doing nothing but obeying the proper order of that court, and could do nothing else ; it would be an improper thing not to go on and try the case against this defendant.

The object of the Supreme Court in sending it down to us, as I have said, was for the purpose of obtaining further information as to what was the real and true character and proper workings of this corporation known as the Insurance Patrol of the City of Philadelphia. Those objections, founded upon what is supposed to be the conclusive effect of the judgment entered, may be regarded as out of the case. I shall negative all the points which have been presented by counsel for the defendant under that head. I believe they are ten in number. I say to the jury that they have nothing to do with the case as it now stands before you.

There are other grounds of exception to the right of the plaintiffs upon which it is objected that the plaintiffs ought not to recover, which take the ground that this corporation is a charity and that there can be no recovery against it as a charity.

When that question was before the court upon the case as it then stood, the only evidence as to the character of the corpo-

ration being the charter itself, that was all the evidence which the jury and the court had before it at that time, and the court entered a nonsuit as to these defendants upon that ground. But we have a very different case before us now.  We have not only the charter, but we have the evidence which has been presented to the jury showing how this organization called the Insurance Patrol of Philadelphia came into existence in the first place.  It was as a voluntary association together by the representatives of the fire insurance companies of the city of Philadelphia.  The object being, as they said, to preserve and protect life when in danger by fire, and also to protect property when in danger by conflagration.  [That corporation was afterward incorporated, and the evidence upon which the plaintiffs rely now as having established clearly that this is in the eye of the law not a charity, at least not such a charity as will protect it from responsibility for the acts of its agents, has been given to the jury with very considerable detail.  The result of that testimony, it may be briefly stated, has been to show that the main object for which this association was originally formed, the main object for which it was afterwards incorporated, the main object it has in view in continuing its existence from year to year, is to benefit in a pecuniary point of view the insurance companies who contribute and thereby become members of the corporation, who contribute to the support of this Insurance Patrol.

There can be no question under this testimony, if it is believed by the jury—and it is the testimony of the defendants themselves—but that this is the principal object which these defendants have in view in carrying on the operations of this Insurance Patrol.  They send out their agents, who go to fires and who protect property as far as they are able to protect it. They are entitled to do just what they undertake to do.  That is, to protect or to save life and to protect property; but they are in subordination, so far as their own actions at fires are concerned, to the Fire Department of the city of Philadelphia.  It does not alter the case that this Insurance Patrol and the Fire Department of the city of Philadelphia, as a rule, have worked in harmony, and perhaps have always done so, in the extinguishment of fires.  The fact remains that by the charter itself this organization or this corporation is put aside when the authorities of the Fire Department of the city undertake to exercise au-

thority. Then it is the duty of this corporation to stand aside. They cannot in any way interfere with the orders or with the directions of the chief engineer or fire marshal of the city of Philadelphia. So that it does not at all alter the character of this corporation, that their object is to save property and to save life. I mean so far as this case is concerned. I take it that there can be no charity such as would exempt it from liability to answer for the wrongful acts of its servants, except that which is a pure and simple charity. Nor do I think that it makes any difference whether this pecuniary benefit received by the parties who claim to be protected under this principle of law is a direct or indirect benefit.] [a]

There is no doubt about the fact under this evidence that there is no corporate stock in this association. There are no profits and no dividends distributed among the corporators of this Insurance Patrol; but according to the testimony of several of the witnesses, the great and principal object for which it exists is, that it may benefit pecuniarily the insurance companies who, by their contributions, support it and keep it in existence. It seems to me that whenever a corporation, claiming to be a charity, puts itself in the position before the law of saying that, however commendatory the saving of life and property may be, yet that great object of its existence is to make money for some persons, and that they are to receive a profit and benefit growing out of the operations of that corporation, whether it be directly or indirectly, that moment all claim to its right to be a charity, such as the law may possibly protect, passes out of the case.

That is the condition in which, if you believe this evidence, this corporation stands before you to-day. Therefore, upon all the points upon which I have been asked to charge you in regard to this being a charity, and therefore not responsible for the acts of its servants, I shall answer them in the negative. I think, when it is shown that this organization is an organization really to bring pecuniary benefit into the pockets of any person at all, that being one of the objects according to the testimony of several of the witnesses, and the principal object for which it exists, that that moment its entire right to claim to stand as a charity is at an end.

Considering those questions out of the way, what remains to

be determined by the jury? It is alleged upon the part of the defendants that Mr. Boyd in part brought his death upon himself—that he contributed to bring it upon himself. The principle of law is that where one is injured by the negligence or wrongful act of another, if that other person upon whom the injury falls acts himself negligently and carelessly so that his negligence and carelessness contributes to bring the injury upon himself, he defeats his right to recover as against the party who is sued for having inflicted injury or damage upon him; and the contention on the part of the defendant here is that, according to the evidence in this case, the jury ought to find that Mr. Boyd was guilty of contributory negligence, and therefore that he cannot recover.

[The remaining part of the charge was in answer to the points as to contributory negligence and upon the subject of damages.]

The verdict of the jury was in favor of the plaintiffs for $39,000. On April 29, 1887, a motion for a new trial was made, and pending this motion, on April 30th, a rule was taken upon the defendant to show cause why the judgment of June 12, 1885, against Hutchinson, should not be stricken off, which rule on May 14, 1887, was made absolute; but on the same day a rule was granted upon the plaintiffs to show cause why judgment should not be again entered upon the verdict against Hutchinson, the jury fee having been paid. On June 1, 1887, the plaintiffs remitted all the interest upon the verdict rendered January 28, 1885, against Hutchinson, and all the verdict rendered on April 27, 1887, against The Fire Insurance Patrol, over the sum of $25,000. The same day the rule upon the plaintiffs of May 14, 1887 was made absolute, the jury fee paid on both verdicts by the plaintiffs and judgment entered thereon. Then the defendant, The Fire Insurance Patrol, took this writ, filing forty-two specifications of error, of which were ·

13. The court below erred in refusing to affirm the following point presented by the defendant for the court to charge the jury upon: "3. This being a joint suit against three joint tortfeasors for a joint tort, and a judgment having been already entered in the said suit on the issue joined in the said suit against Hutchinson, one of the defendants, this court cannot

enter now a legal judgment against the present defendant, The Fire Insurance Patrol of Philadelphia, on the facts found by the jury in the present case, and the jury must find for the defendant."

Answer: I negative this point.

30–35. The refusal of defendant's points.[30 to 35]

*Mr. George W. Biddle* and *Mr. Arthur Biddle* (with them *Mr. H. La Barre Jayne*), for the plaintiff in error:

I. In a joint action of tort, upon an issue raised by a joint plea, the plaintiff may not have more than one judgment, and the jury cannot render separate verdicts and make separate assessments of damages against joint tort-feasors: Hill v. Goodchild, 5 Burr. 2790; Salmon v. Smith, 1 Saunders 207 A, n. 2; McCarthy v. DeArmit, 1 Penny. 310; Huddleston v. West Bellevue, 111 Pa. 110; Cridland v. Floyd, 6 S. & R. 412; Breidenthal v. McKenna, 14 Pa. 160; Beltzhoover v. Commonwealth, 1 W. 126; Williams v. McFall, 2 S. & R. 280; Shively v. United States, 5 W. 332. Moreover, the judgment of June 12, 1885, was regular on its face and, though entered at the instance of defendant's counsel, the court had no power to strike it off: § 77, act of April 14, 1834, P. L. 355; Maguire v. Burton, 1 M. 18; Moser v. Mayberry, 7 W. 12; Breden v. Gilliland, 67 Pa. 37; Huston v. Mitchell, 14 S. & R. 307.

II. The defendant company being a corporation created by the legislature, not for profit or private emolument, but for the purpose of performing certain public functions delegated to it by the sovereign power of the state, is a public agent of the state government and consequently not liable for the malfeasance or negligence of employees, selected by it, who are in reality public employees or servants of the commonwealth.

1. No action will ordinarily lie against an agent, for the misfeasance or for the negligence of those whom he has retained for the service of his principal by his consent or authority, any more than it will lie against a servant who hires laborers for his master, at his request, for their acts; unless, indeed, in either case, the particular acts which occasion the damage are done by the orders or directions of such agent or servant. The action under other circumstances must be brought either against the principal or against the immediate actors in the wrong:

Story on Agency, § 313. In other words, the liability of a servant of the public is not greater than that of the servant of any other principal; though the recovery against the principal, the public, cannot be by action. This general rule of law has been extended to all cases where a corporation defendant exercises in fact a mere function of the government, whether it is a county, or a township, or town, or other political division of the state, or a municipality having a special charter from the legislature. It also applies to all those agencies constituted by the state, whether in the form of corporations, or boards of managers, or charities, or other like institutions, in so far as they are the mere agents of the state in the exercise of what is clearly a governmental function. And it has repeatedly been held, in this state and elsewhere, that the duty of extinguishing fires and saving property therefrom is a public duty, and that the agency to which such authority is delegated is a public agent and not liable for the negligence of its employees: Knight v. Philadelphia, 15 W. N. 307 ; Hafford v. New Bedford, 16 Gray 297 ; Fisher v. Boston, 104 Mass. 87 ; O'Meara v. New York, 1 Daly 425 ; Howard v. San Francisco, 51 Cal. 52 ; Hayes v. Oshkosh, 33 Wis. 314 ; McKenna v. St. Louis, 6 Mo. App. 320 ; Wheeler v. Cincinnati, 19 Ohio 19 ; Brinkmeyer v. Evansville, 29 Ind. 187 ; Grant v. Erie, 69 Pa. 420 ; Jewett v. New Haven, 38 Conn. 368, 375 ; Freeman v. Philadelphia, 7 W. N. 45 ; Patterson v. Penn. Reform School, 92 Pa. 229. Obviously, and on the authority of all the foregoing cases, the legislature can select whom it pleases, to perform the public functions of government, and it is not restrained from delegating public powers to any particular classes, bodies or persons.

2. This being the general law, it remains to inquire what is the position of the defendant company in regard to it, and how far the acts done by it are public acts. done, not for its private gain, as distinguished from the rest of the public, but as functions of government discharged for the benefit of the general public.

(a) Manifestly, apart from any constitutional provision, the charter of the Fire Insurance Patrol is not a contract, but a mere license which may be altered or repealed at the will of the legislature. It will not be contended for a moment that the legislature can delegate the powers, delegated to this cor-

poration, so as absolutely to divest itself of the right of control at fires. (*b*) It is likewise clear that the duty delegated is a public one, the public function of preserving property from fire in Philadelphia having been legally delegated by the state, in part to the city corporation, and in part to the defendant: Act of February 2, 1854, P. L. 42; act of April 26, 1871, P. L. 59. (*c*) It is also evident that the whole public are interested in the grant made. The duty of the patrol is to save all property, whether covered by insurance or not. The testimony shows that the officers and employees strictly perform this duty without discrimination. (*d*) It is also demonstrated that the corporation receives no gain or profit; that it has no stock, nor does it pay any dividends; that its subscribers, who happen to be insurance companies, derive no pecuniary profit; that the members need not be insurance companies, and they voluntarily undertake the burden of support, and when property is saved they gain no more than the public at large: Commonwealth Ins. Co. v. Sennett, 41 Pa. 161; Chapman v. Pole, 22 L. T., N. S. 307; Carpenter v. Insurance Co., 16 Pet. 510–11. Finally, (*e*) it must appear, that the funds being voluntary donations for a public object, they are held by the officers of the patrol in trust for the public.

III. The Fire Insurance Patrol, being a public charitable corporation having no fund appropriated to the payment of damages to individuals for injuries caused by the negligence of its officers or employees, it is not liable in actions therefor.

1. The funds for the support of all public charities are derived from the donors for the specific purpose of carrying out the objects of the charity, and all donations are clothed with a trust for these purposes which could be asserted at the suit either of the donors themselves, or of the attorney-general. It is obvious that an unincorporated association of people, using money contributed to them for a specific charity, could not, if a tort was committed by one of their agents, appropriate the trust funds in case of a judgment obtained against them, or any of them, by reason of the tort. A public charity, whether incorporated or unincorporated, is nothing but a trustee in the same position. This is no novel doctrine. It is logical in principle, and the principle has been recognized in England since the reign of Edward V., with no dissentient case; and in this

country, so far as we are aware, there is but one case, in Rhode Island, to the contrary: Year Book, 1 Edw. V. 10, p. 4; Russell v. Men of Devon, 2 T. R. 672–3; Feoffees of Heriot's Hospital v. Ross, 12 C. & F. 506; Riddle v. Proprietors of Locks, 7 Mass. 187; McDonald v. Mass. Gen. Hospital, 120 Mass. 432; Sherbourne v. Yuba County, 21 Cal. 113; Brown v. Vinalhaven, 65 Me. 402; Mitchell v. Rockland, 52 Me. 118; Richmond v. Long's Admr., 17 Gratt. 375; Ogg v. Lansing, 35 Ia. 495; Murtaugh v. St. Louis, 44 Mo. 479; Patterson v. Reform School, 92 Pa. 229; Erie v. Schwingle, 22 Pa. 384; Hamilton County v. Mighels, 7 Ohio St. 109; Maximillian v. Mayor, 62 N. Y. 160.

2. From a perusal of §§ 3 and 4 of the charter of the defendant company, it appears that it possesses the public duty delegated to it of saving life and property from flames, with full power to enter any building threatened by the flames. Thus armed with high police powers and performing duties for the benefit of the public, with no provision in any part of its charter for the acquisition of private advantage or emolument, it is a public charitable corporation: Magill v. Brown, Brightly, 346, 380, 381, 406; Thomas v. Ellmaker, 1 Clark 502; s. c. 1 Pars. 98; Humane Co.'s App., 88 Pa. 389; Riddell v. Harmony F. Co., 8 Phila. 313; Commonwealth v. Hibernia Eng. Co., 1 W. N. 187; Bethlehem Bor. v. Fire Co., 81 Pa. 445.

3. But it is objected that the defendant is not a public charitable corporation, because the leading motive for its maintenance, as it is alleged, is the pecuniary benefit derived by the insurance companies from its existence. The question then resolves itself into this: Does the motive that induces a donation to a public charity alter the legal effect of a charitable use? Sir John LEACH in British Museum v. White, 2 Sim. & St. 596, defined a charitable gift to be " every gift for a public purpose, whether local or general, although not a charitable use within the common and narrow sense of these words." A more practical definition is that of Lord CAMDEN, in Jones v. Williams, Ambler, 651: " A gift to a general public use which extends to the poor as well as to the rich." And see: Morice v. Bishop of Durham, 9 Ves. Jr. 405; Coggeshall v. Pelton, 7 Johns. Ch. 294; Mitford v. Reynolds, 1 Phillips Ch. 191; Perrin v. Carey, 24 How. 506; Jackson v. Phillips, 14 Allen 556; Wright v

Linn, 9 Pa. 437; Boyle on Charities, 51; Cresson's App., 30 Pa. 450. In none of the definitions given in these cases, is it stated or even hinted at, that the motive of the gift is material; nor, it is submitted, has the motive of the donor ever been held, either in Pennsylvania or elsewhere, to affect the legal character of the charitable donation, though frequently the contrary has been held: Magill v. Brown, Brightly, 384; White v. White, 7 Ves. Jr. 423; Attorney-General v. Price, 17 Ves. Jr. 371; Attorney-General v. Bucknall, 2 Atk. 328; Isaac v. DeFriez, 17 Ves. Jr. 374 n.; Martin v. McCord, 5 W. 494; Flaherty's Est., 2 Pars. 186; Wright v. Linn, 9 Pa. 433; Miller v. Porter, 53 Pa. 301; Price v. Maxwell, 28 Pa. 23; Donohugh's App., 86 Pa. 306; Burd Orphan Asylum v. School Dist., 90 Pa. 28; McMillen's App., 11 W. N. 442; Manners v. Library Co., 93 Pa. 174; Humane Co.'s App., 88 Pa. 389. It is therefore respectfully submitted that the defendant is a public charity, and the court below erred in not so holding it.

*Mr. George Junkin*, for the defendants in error:

I. The entry of the judgment against Hutchinson, by the attorneys for the defendants, was unauthorized. A judgment is to be entered only on the motion of the party for whom the verdict is given: § 13, act of March 29, 1805, 4 Sm. L. 242; Rule of Court, 96; § 77, act of April 14, 1834, P. L. 355; McGlue v. Philadelphia, 105 Pa. 237. Every court has the power to strike off a judgment improperly entered by the prothonotary, or even by itself, and though on the face of the record it may seem to be regular: McGlue v. Philadelphia, supra; Breden v. Gilliland, 67 Pa. 37; Maguire v. Burton, 1 M. 14. See also Mitchell on Rules, 75, 76; Scott v. Wilmer, 1 W. N. 41; Tobias v. Dorsey, 2 W. N. 15; Scott v. Loughery, 6 W. N. 123; Stadelman v. Penn. Co., 6 W. N. 134; O'Hara v. Baum, 82 Pa. 416; Banning v. Taylor, 24 Pa. 289; Hutchinson v. Ledlie, 36 Pa. 112; Kellogg v. Krauser, 14 S. & R. 137, 143.

II. This court in Boyd v. Insurance Patrol, 113 Pa. 269, had the charter of this corporation before it, and it held that by its charter alone it was not constituted " a public agent, auxiliary to the city government of Philadelphia, or to its fire department." It was " of course, neither a municipal corporation,

nor a public officer." "If it be," this court said, "that the Insurance Patrol has been invested with a public function, which it exercises for the public good, as a public agent and not for private gain," "the facts should appear in the proofs."

1. The court below gives a clear and accurate history of the corporation and its workings: Charge of Court below in [ ].*a* The testimony [reviewed at length] establishes beyond doubt that the Fire Insurance Patrol (not Fire Patrol) is now, just what it was before its charter was obtained, not an agent of the commonwealth, or of the city municipality, or of the public, but a mere agent of the fire insurance companies, endowed by them with its plant, and maintained by them, not as the public's agent to save life or to save property for the public generally, or to carry on a great charity, but simply an agency to make gain and profit to its members. The penny saved is a penny made.

2. It is needless to review in detail the cases cited by the defendant upon this subject. All of them are cases where the public, either as a government or a municipality, through public officers, is performing public duties for the public generally, and with no gain or profit. In all such cases, actions in the premises are open to the inspection and control of the public; the public has nothing to do with this corporation. As said before by this court in this case: "A private corporation, exercising a public function, or engaged in charitable work for private gain, can certainly in no sense be characterized, either as a public agent or as a public charitable institution."

III. Whether the defendant is a public charitable corporation, was the great question raised in this court upon the first trial on the charter alone, and on the second trial attempted to be answered by the proofs.

1. "But, that which is the purpose of a public charity may be the distinctive purpose of a trading corporation, out of which it is proposed to realize profits. It is not the object alone of a corporation which makes it charitable within the meaning of the law; it is the mode in which that object is sought to be attained, as well as the purpose for which it is pursued:" CLARK, J., in Boyd v. Insurance Patrol, 113 Pa. 280. Of course, the defendant company differs from this opinion: "The transfer to a charitable use need not be for the love of God and your

neighbor." That this corporation, however, has the power given it to establish a business to accomplish a good and proper object, is not enough. It must go further and show, either that its charter compels it to seek the saving of human life and property of all alike, irrespective of whose is the life, or whose. is the property, from purely charitable or public motives, and not for profit or gain, or, that in fact the business is so carried on. The moment the "stain or taint of gain" enters into the act done, it ceases to be a charity: Opinion of MITCHELL, J., affirmed in Donohugh's App., 86 Pa. 308. The question is not as to the mere motive for which this corporation was created, equipped and is now administered, but the purpose and real object sought to be attained. The defendant is a close private corporation, sustained solely by the subscribers as a " business operation," as avowed in the testimony by the men who created it and have managed it. The main purpose for which it was organized was " to prevent damage to goods insured " " in a dollars and cents view." " The controlling purpose and object of the contributors is their own benefit." " A good financial business operation." " It makes money for our stockholders." It is idle to say, in the face of the testimony of the witnesses, that this defendant is to stand by the side of our old volunteer fire companies, or the fire department of the city, or our hospitals, asylums, schools, homes for the poor, etc. The case of Glavin v. Rhode Island Hospital, 12 R. I. 411, where the subject is carefully and thoroughly discussed, repudiates this new doctrine.

2. But, assume that defendant is a charitable corporation. Suppose some benevolent individual founds a hospital and his ambulance driver carelessly runs over and maims a person. The founder, being a volunteer in what he did, would certainly not be protected from the consequences of his employee's misfeasance. In no sense is he performing a public duty and protected by the principle of the class of cases where a public duty is performed by a municipality, or the government, through its officers or agents, as in Freeman v. Philadelphia, 7 W. N. 45; Knight v. Philadelphia, 15 W. N. 307, and other cases cited. But it is believed that no case can be found anywhere, in which the principle upon which these cases were based, was extended to any one who was a mere volunteer, or where the duty was not

performed by the public itself, in or through a municipality, or an officer selected by the people or the government, and gratuitously and for the benefit of the whole community.

3. It is the doctrine of trusts, and this alone, which appears to give any support to the novel position upon which the defendant relies. The argument is more specious than sound. It would relieve trust estates or properties from all liability for unwise, or imprudent, or carelessly made contracts. The officers and agents of such a corporation may make contracts, in the line of the trust, for supplies or the like necessary to carry out the purpose for which the trust was created. But it would be no answer to the party with whom the contract was made, that as a result of enforcing it, the trust funds would be lost thereby. The trust must respond. Does it make any difference to the person injured by the negligence or carelessness of the officers or their employees, that, in one case, the injury results from what the law calls a breach of contract, and the other from what it calls a tort? The only authorities cited to sustain this novel doctrine are two: (1) Feoffees of Heriot's Hospital v. Ross, 12 Cl. & F. 507, which case was well decided, but upon wrong grounds, and these grounds were virtually overruled by the subsequently well-considered cases of Gibbs v. Mersey Docks, L. R. 1 H. of L. 93, and Parnaby v. Lancaster Canal Co., 11 Ad. & E. 223. (2) McDonald v. Mass. Gen. Hospital, 120 Mass. 432, is the only other case cited, and it distinctly recognizes the doctrine that the corporation might be liable if a proper case of negligence or tort had been made out. Glavin v. Rhode Island Hospital, 12 R. I. 411, wherein McDonald v. Mass. Gen. Hospital is reviewed, decided that "The general trust funds of a charitable corporation are liable to satisfy a judgment in tort recovered against it for the negligence of its servants." That case is respectfully commended to the consideration of this court.

OPINION, MR. JUSTICE PAXSON:

When this case was here upon a former writ of error (see 113 Pa. 269), we did not decide the question whether the Fire Insurance Patrol was such a corporation as to be exempt from the rule of respondeat superior, for the reason that we had little before us but the charter itself, and that was not regarded as sufficient to show satisfactorily the character of the corpora-

tion.   The case now comes up to us with additional light, and we have no difficulty in arriving at a conclusion.

Of the forty-two assignments of error I shall discuss only six, viz.: the 30th to the 35th inclusive.   The first five of these assignments present, in various forms, the question whether the Insurance Patrol is a public charity, while the 35th alleges that the court below erred in not giving the jury a binding instruction that the defendant was not liable in this action.

As disclosed by the charter "The object of the corporation was to protect and save life and property in or contiguous to burning buildings, and to remove and take charge of such property or any part thereof, when necessary."   As disclosed by the evidence, it appears to be a corporation without capital stock or moneyed capital; that it is supported by voluntary contributions, derived from different fire insurance companies; that its object and business is to save life and property in or contiguous to burning buildings; that in saving and protecting such property no difference is made between property insured and property which is not insured; that no profits or dividends are made and divided among the corporators.

Passing by for the present the question of a public charity, it seems plain that this corporation might well have been created by the state in aid of the municipal government of the city of Philadelphia.   It is one of the recognized functions of municipal government, to suppress and extinguish fires.   For this purpose the city has a paid fire department, which has taken the place of the volunteer fire department formerly in existence.   It is as much the province or duty of the city to save life and property at fires as to extinguish such fires, and the Fire Insurance Patrol might well have been organized as an auxiliary to the city government and placed under its direct control.   That it aids the city as a volunteer does not alter the fact that it is still an auxiliary of the municipal government, performing functions which that government might properly perform, just as did the old volunteer fire department.

Is the Insurance Patrol a public charitable institution?   The learned court below held that it was not, upon the ground that the main object of the institution was to benefit the insurance companies, who were the chief contributors to its funds.   In other words, the learned judge tested the nature and character

of the institution by the motives of its contributors. We might be driven to the same conclusion were we to adopt Mr. Binney's definition as found in his argument in the Girard Will Case, as the test of a public charity, where he said : " It is whatever is given for the love of God, or for the love of your neighbor, in the catholic and universal sense; given from these motives, and to those ends, free from the stain or taint of every consideration that is personal, private or selfish." This is undoubtedly charity in its highest and noblest sense. The Recording Angel might well point to it with satisfaction; and it may be the test in the Great Hereafter, but were we to apply it to the transactions of this wicked world, I fear it would lead to serious embarrassment. In the first place, it is utterly impracticable, for it is God only who can look into the heart and judge of motives. In the second place, if we had the power of omniscience and were to apply it, what would be the result? How many of our noblest and most useful public charities would stand such a test? How many donations to public charities are made out of pure love to God and love to man, free from the stain or taint of every consideration that is personal, private or selfish? Who can say that the millionaire who founds a hospital or endows a college, and carves his name thereon in imperishable marble, does so from love to God and love to his fellow, free from the stain of selfishness? Yet, is the hospital or the college any the less a public charity because the primary object of the founder or donor may have been to gratify his vanity, and hand down to posterity a name which otherwise would have perished with his millions? There is ostentation in giving, as well as in the other transaction of life. In some instances donations to public charities may be in part due to this cause; in others, there may be the expectation of indirect pecuniary gain or return. The professional man who gives freely to his church may not be insensible to the fact that liberality makes friends and sometimes increases clientage. Coiled up within many a gift to a public charity, there is a secret motive, known only to the searcher of all hearts. It may be to benefit the donor in this world or to save his soul in the next. It would be as vain as it would be unprofitable for a human tribunal to speculate upon the motives of men in such cases. Nor is it necessary for any legal purpose. The money which

is selfishly given to public charity does as much good as that which is contributed from a higher motive, and in a legal sense the donor must have equal credit therefor. We must look elsewhere for a definition of a legal public charity.

In Morice v. Bishop of Durham, 9 Ves. 405, it was said by Sir William GRANT that those purposes are considered charitable which are enumerated in the statute of 43d Elizabeth, or which by analogy are deemed within its spirit and intendment. It is true that this statute of Elizabeth is not in force in Pennsylvania, but its principles are a part of the common law: Cresson's Appeal, 30 Pa. 450. In British Museum v. White, 2 Sim. & S. 596, a charitable gift was defined to be, "Every gift for a public purpose, whether local or general, although not a charitable use within the common and narrow sense of those words." In Jones v. Williams, Ambler 651, Lord CAMDEN gives this practical definition, viz.: "A gift to a general public use which extends to the poor as well as to the rich." This definition has been repeatedly approved by this and other courts: See Wright v. Linn, 9 Pa. 433; Coggeshall v. Pelton, 7 Johns. Ch. 294; Milford v. Reynolds, 1 Phil. Ch. R. 191; Perrin v. Carey, 24 How. 506; Jackson v. Phillips, 14 Allen 556.

These brief citations from the English authorities are deemed sufficient. I now turn to our own and other states. In Cresson's Appeal, 30 Pa. 437, this court, after citing with approval Jones v. Williams, supra, said: "In order to ascertain what are charitable uses, the English courts have generally resorted to the preamble of the act of parliament, 43 Elizabeth. That enumerates twenty-one, and among them are found the following: Repairs of bridges; repairs of ports and havens; repairs of causeways; repairs of sea-banks; repairs of highways; fitting out soldiers; other taxes. And beyond the enumeration contained in that act, many other gifts have been recognized as common law gifts to charitable uses, for example: for cleansing the streets, maintenance of houses of correction; for the true labor and exercise of husbandry, for public benefit. These cases and many others are collected in Magill v. Brown, Brightly 347. It is true the statute of Elizabeth is not in force as a statute in Pennsylvania, but, as before stated, its principles are part of our common law. The case of Magill v. Brown was a Pennsylvania case, and there it was held that a bequest for a fire engine and hose was a

gift for a charitable use." In Jackson v. Phillips, 14 Allen 556, a charity was defined by Justice GRAY as follows: " A charity, in legal sense, may be more fully defined as a gift to be applied consistently with existing laws, for the benefit of an indefinite number of persons, either by bringing their minds or hearts under the influence of education or religion, by relieving their bodies from disease, suffering or constraint, by assisting them to establish themselves in life, or by erecting or maintaining public buildings or works, or otherwise lessening the burdens of government." This definition has been cited approvingly, not only by text writers but by other courts. In Miller v. Porter, 53 Pa. 292, there was a bequest by Porter to a university which was to bear his name, and this court said: " You say it (The Porter University) was not founded to promote religion or religious education, but to immortalize the founder, and therefore it was not a charity. If the premises be granted, the conclusion does not follow, because though it has no stamp of religion, and the selfishness of motive may take away from it the high and abstract quality of a Christian charity, yet it was to be a seat of learning—a university—a centre from which the rays of educated intelligence were to radiate in all directions; and, if to found a school house at the cross-roads of a township be a legal charity though the selfish motive be apparent, much more to found such a university is a legal charity; and, if a charity within the legal sense of that word, then it is as much within the purview of the statute as a bequest to the West Town School, and Price v. Maxwell rules the case." Following in this line of thought is Manners v. The Library Co., 93 Pa. 165, where it was held in the case of a public charity that the intent of the testator will not be defeated because a secondary intent may be illegal, for if it be unlawful it will be disregarded. In the appeal of The Humane Fire Company, 88 Pa. 389, it was distinctly ruled by this court that the association was a public charity. That company was one of the members of the old volunteer fire department of the city of Philadelphia; was organized for the purpose of extinguishing fires, and was supported just as the Fire Insurance Patrol is supported, by voluntary contributions. It is true many of its contributions came from private citizens, but I am unable to see any distinction between contributions to a fire company or insurance patrol,

made by individuals and those made by corporations. In both cases a corresponding benefit is expected. It would be idle to say that the insurance companies do not expect to diminish their losses by their support of the Insurance Patrol. But has the private citizen who contributes to a fire company any higher motive? Does he pay his money out of love to God and love to man, or does he pay it to protect his property?

It will be noticed that in no one of the cases cited is the motive of the donor made a test of a charity. While it is true that a gift within the definition of Mr. Binney is a good charitable use, and in a moral sense perhaps the best, it has never been held that said definition is a test of a charity. On the contrary this court held in Martin v. McCord, 5 W. 493, that the accession to a charity need not be by gift, but may be by contract; and that the accession to the charitable use from one who gave ground for a school house, if the neighbors would go on and build a decent house on it for the benefit of the neighborhood, and for the benefit of his grandson John, whom he wished to send to school, was good; and SERGEANT, J., said "not as a gift, but as a purchase for a valuable consideration," and the neighbors were the trustees for a charitable use. And in Miller v. Porter, supra, we have already seen that this court expressly repudiated the idea that the selfish motive affected the legal nature of the gift or use, and held that the object of the bequest only, and not the motive, governed its legal effect. The true test of a legal public charity is the object sought to be attained; the purpose to which the money is to be applied; not the motive of the donor.

Our conclusion is that the Fire Insurance Patrol of Philadelphia is a public charitable institution; that in the performance of its duties it is acting in aid and in ease of the municipal government in the preservation of life and property at fires. It remains to inquire whether the doctrine of respondeat superior applies to it. Upon this point we are free from doubt. It has been held in this state that the duty of extinguishing fires and saving property therefrom is a public duty, and the agent to whom such authority is delegated is a public agent and not liable for the negligence of its employees. This doctrine was affirmed by this court in Knight v. City of Philadelphia, 15 W. N. 307, where it was said: "We think the court did not com-

mit any error in entering judgment for the defendant upon the demurrer. The members of the fire department are not such servants of the municipal corporation as to make it liable for their acts or negligence. Their duties are of a public character, and for a high order of public benefit. The fact that this act of assembly did not make it obligatory on the city to organize a fire department, does not change the legal liability of the municipality for the conduct of the members of the organization. The same reason which exempts the city from liability for the acts of its policemen, applies with equal force to the acts of the firemen." And it would seem from this and other cases to make no difference as respects the legal liability, whether the organization performing such public service is a volunteer or not: Jewett v. New Haven, 38 Conn. 379; Russell v. Men of Devon, 2 T. R. 672; Feoffees of Heriot's Hospital v. Ross, 12 C. & F. 506; Riddle v. Proprietors, 7 Mass. 187; McDonald v. Hospital, 120 Mass. 432; Boyd v. Insurance Patrol, 113 Pa. 269. But I will not pursue this subject further, as there is another and higher ground upon which our decision may be placed.

The Insurance Patrol is a public charity; it has no property or funds which have not been contributed for the purposes of charity, and it would be against all law and all equity to take those trust funds, so contributed for a special, charitable purpose, to compensate injuries inflicted or occasioned by the negligence of the agents or servants of the patrol. It would be carrying the doctrine of respondeat superior to an unreasonable and dangerous length. That doctrine is at best—as I once before observed—a hard rule. I trust and believe it will never be extended to the sweeping away of public charities; to the misapplication of funds, specially contributed for a public charitable purpose, to objects not contemplated by the donors. I think it may be safely assumed that private trustees, having the control of money contributed for a specific charity, could not in case of a tort committed by one of their members, apply the funds in their hands to the payment of a judgment recovered therefor. A public charity, whether incorporated or not, is but a trustee, and is bound to apply its funds in furtherance of the charity and not otherwise. This doctrine is hoary with antiquity and prevails alike in this country and in Eng-

land, where it originated as early as the reign of Edward V., and it was announced in the Year Book of that period. In the Feoffees of Heriot's Hospital v. Ross, 12 C. & F. 506, a person eligible for admission to the hospital brought an action for damages against the trustees for the wrongful refusal on their part to admit him. The case was appealed to the House of Lords when it was unanimously held that it could not be maintained. Lord COTTENHAM said: "It is obvious that it would be a direct violation, in all cases, of the purpose of a trust if this could be done; for there is not any person who ever created a trust that provided for payment out of it of damages to be recovered from those who had the management of the fund. No such provision has been made here. There is a trust, and there are persons intended to manage it for the benefit of those who are to be the objects of the charity. To give damages out of a trust fund would not be to apply it to those objects which the author of the fund had in view, but would be to divert it to a completely different purpose." Lord BROUGHAM said: "The charge is that the governors of the hospital have illegally and improperly done the act in question, and therefore, because the trustees have violated the statute, therefore—what? Not that they shall themselves pay the damages, but that the trust fund which they administer shall be made answerable for their misconduct. The finding on this point is wrong, and the decree of the court below must be reversed." Lord CAMPBELL: "It seems to have been thought that if charity trustees have been guilty of a breach of trust, the persons damnified thereby have a right to be indemnified out of the trust funds. That is contrary to all reason, justice and common sense. Such a perversion of the intention of the donor would lead to most inconvenient consequences. The trustees would in that case be indemnified against the consequences of their own misconduct, and the real object of the charity would be defeated. Damages are to be paid from the pocket of the wrong doer, not from a trust fund. A doctrine so strange, as the court below has laid down in the present case, ought to have been supported by the highest authority. There is not any authority, not a single shred here to support it. No foreign or constitutional writer can be referred to for such a purpose." I have quoted at some length from the opinions of these great

jurists because they express in vigorous and clear language the law upon this subject. I have not space to discuss the long line of cases in England and this country in which the above principle is sustained. It is sufficient to refer to a few of them by name: Riddle v. Proprietors of the Locks, 7 Mass. 187; McDonald v. Massachusetts General Hospital, 120 Mass. 432; Sherbourne v. Yuba Co., 21 Cal. 113; Brown v. Inhabitants of Vinalhaven, 65 Me. 402; Mitchell v. City of Rockland, 52 Me. 118; City of Richmond v. Long, 17 Grattan 375; Ogg v. City of Lansing, 35 Ia. 495; Murtaugh v. City of St. Louis, 44 Mo. 479; Patterson v. Penn. Reform School, 92 Pa. 229; Maximillian v. Mayor, 62 N. Y. 160.

I am glad to be able to say that no state in this country, or in the world, has upheld the sacredness of trusts with a firmer hand than the state of Pennsylvania. Not only is a trustee for a public or private use not permitted to misapply the trust funds committed to his care, but if he convert them to his own use the law punishes him as a thief. How much better than a thief would be the law itself, were it to apply the trust's funds contributed for a charitable object, to pay for injuries resulting from the torts or negligence of the trustee? The latter is legally responsible for his own wrongful acts. I understand a judgment has been recovered against the individual whose negligence occasioned the injury in this case. If we apply the money of the Insurance Patrol to the payment of this judgment, or of the same cause of action, what is it but a misapplication of the trust fund; as much so as if the trustees had used it in payment of their personal liabilities? It would be an anomaly to send a trustee to the penitentiary for squandering trust funds in private speculations, and yet permit him to do practically the same thing by making it liable for his torts. If the principle contended for here were to receive any countenance at the hands of this court, it would be the most damaging blow at the integrity of trusts which has been delivered in Pennsylvania. We are not prepared to take this step.

We are not unmindful of the fact that it was contended for the defendant in error that the case of Feoffees of Heriot's Hospital v. Ross, is in conflict with Mersey Docks v. Gibbs, L. R. 1 E. & I. App. Cas. 93, and Parnaby v. Lancaster Canal Co., 11 Ad. & E. 223. I am unable to see any such conflict. The

two corporations last named were evidently trading corporations and in no proper sense public charities. In regard to the docks, it was said by BLACKBURN, J., at page 465 : " There are several cases relating to charities which were mentioned at your Lordship's Bar, but were not much pressed, nor, as it seems to us, need they be considered now ; for whatever may be the law as to the exemption of property occupied for charitable purposes, it is clear that the docks in question can come within no such exemption."

I will not consume time by discussing the case of Glavin v. Rhode Island Hospital, 12 R. I. 141, which, to some extent, sustains the opposite view of this question. There, a hospital patient paying eight dollars per week for his board and medical attendance, was allowed to recover a verdict against the hospital for unskilful treatment, and it was held that the general trust funds of a charitable corporation are liable to satisfy a judgment in tort recovered against it for the negligence of its officers or agents. It is at least doubtful, whether under its facts the case applies, and if it does, we would not be disposed to follow it in the face of the overwhelming weight of authority the other way, and of the sound reasoning by which it is supported.

The foregoing is little more than a re-assertion of the views of this court as heretofore expressed in this case by our brother CLARK : See 113 Pa. 269. Many of the authorities I have referred to are there cited by him. We are now more fully informed as to the facts of the case, and can apply to them the law as indicated in the former opinion.

We are all of opinion that the Insurance Patrol is not liable in this action, and the judgment against it is therefore

　　　　　　　　　　　　　　　　　　　　Reversed.