Statement of the Case.
MONROE, J.
Plaintiff, who was one of the officers in charge of hook and ladder truck No. 4, of the New Orleans fire department, was injured, whilst going to a fire, as the result of a collision between the truck and fire patrol wagon 'No. 4, belonging to the fire insurance patrol of New Orleans; and, having brought this-suit for damages, obtained judgment for $1,600, from which-the fire insurance patrol has appealed.
The facts, as they appear to us; from .the evidence, are as follows:
On the night of June 23, 1905, between 11 and 12 o’clock, an alarm of fire was sounded from the corner of Ursuline and Broad streets, and the truck started to the fire. The wagon also started on the same mission (from its house, which is probably a mile or more from that of the truck), and approached the-corner of Galvez and Dumaine streets, by way of Galvez, whilst the truck approached the same comer by way of Dumaine street; Galvez street being, paved, and Dumaine street having a street car track, which was engaged by the wheels of the truck, neither street, at the point of intersection, .being-over; say, 35 or 40 feet in width. The truck carried nine men, and is said to weigh, with its load, some 7,200 or 7,500 pounds; the wagon carried seven men, and is supposed to-weigh (also loaded) 5,000 or 5,200 pounds. Each vehicle was drawn by two horses. The night was dark, and we infer that the lights intended to be provided by the city were temporarily out of commission. The- witnesses, for plaintiff and defendant, respectively, testify that the gongs on the vehicles upon which they were riding were sounded as they approached the corner, but that they did not hear the gong of the other vehicle. The undisputed facts are: That the truck approached the corner, by way of the car track (on Dumaine street), at the speed at which such vehicles usually respond to the alarm of fire; that the wagon approached along the middle-of Galvez street at a speed which will he the subject of further consideration; that, as the result of the collision, the truck, through its acquired momentum carried onward, past the-point of collision and past the liue of Galvez street, .was turned over upon the further side of Dumaine street and its crew thrown, violently to the ground, the driver being so seri *629 ously injured that he died within a couple of days, the captain, who was riding with the driver, and the lieutenant (plaintiff) being knocked senseless, and the latter otherwise injured, and several other men receiving injuries of a less serious character; the truck itself not being very badly damaged. Upon the other hand, save for a slight scratch or abrasion of the skin, received by the captain, who was driving, no one on the wagon was injured, nor was the wagoü overturned. The pole was, however, broken in two, the dashboard was damaged, and the horses, or one of them, received some injuries. The evidence satisfies us that the pole of the wagon came in contact with the truck at a point a short distance behind the near front wheel of the latter, from which we conclude that the heads of the truck horses were at that moment from 12 to 15 feet beyond the place of collision. There was some attempt to show, or rather to theorize to the effect, that the patrol people were at fault in not taking a more direct route (than by Galvez street) from their house to the fire, and that the collision might have been attributable to some defect in the sight of the driver of the wagon ; and, on the other hand, one of the witnesses for the defendant, who was riding on the step at the tail of the wagon and saw nothing, propounds the theory that the truck was capsized by reason of the attempt of the driver to turn the hind wheels off the car track. We dispose of these theories by saying that they are not only unsupported by the evidence but are disproved. We find that King, a witness called on behalf of defendant, testified that, on the night of the accident,- he was engineer of steam fire engine No. 26, which has its house, approximately, in the neighborhood in which the house of patrol wagon No. 4 is situated, so that, in going to the fire in question, they would ordinarily have taken the same route; and we infer that the witness was called to prove that the direct route was considered impossible, and thus explain why it was that the patrol wagon was 'driven by way of Galvez street, a route which seemed circuitous, and the witness testified that No. 26 was driven by the way of Galvez street for the reason stated. He also said that the wagon and No. 26 were driven down Galvez street for‘some distance, side by side, but that, shortly before they reached Dumaine street, he called to the driver of the engine to pull up; thus:
“Q. You were right behind the wagon? A. Yes, sir, we came down the woods side of Galvez street and they went down the river side, and we pulled up. I holloed from the bunker to the driver, ‘Mike, pull up’; X didn’t want no collision. We let the wagon go by us — pulled up — and we came in the wake of the wagon, and the truck had an accident. Q. As a matter of fact, weren’t you and patrol 4 racing that night out Galvez street? A. No, sir; they were on the river side of Galvez and we were on the woods side, but we were side and side, opposite one another, and X was afraid, myself, there might be a collision, and I holloed from the bunker— I says: ‘Pull up, and let the little wagon go by.’ That team was. the fastest; of course, the wagon (engine) driver had sense enough to do that himself. We always gave way to those people. By the Court: Never mind that, Mr. Witness; just answer the questions. By Mr. Elynn (counsel for plaintiff): Q. Now, your team pulled up? A. Yes, sir; they went right on. Q. Did you see the wagon when it struck the track? No, sir, I didn’t see that because I was a block behind it.”
We also find that the other witnesses (five in number) who were called by defendant, and all of whom were on the wagon when the collision occurred, testify that the horses of the wagon were brought under control, and the wagon “slowed down” (or something to that effect), just before they reached Dumaine street. Thus: Manning, lieutenant and driver:
“Q. Now, just before you reached Dumaine-street, upon which there is a car track, what did you do? A. I pulled up the horses, slacked their speed, and put the brake on, and bad them under control.”
Ray, an employé of the patrol, who was seated beside Manning on the wagon:
“Q. Do you recall anything that Lieutenant Manning did, just before he got to Dumaine street? A. He slowed up, as usual, to look out *631 •for the cars. Q. You recollect that, positively? A. Yes, sir; I do, sir.”
Mouret, another patrolman:
“Q. * * * Now, do you know what the driver, Mr. Manning, did, before he arrived at Dumaine street? A. I know that Mr. Manning pulled up a little, as usual, as it was a car crossing. Q. Do you remember that? A. I am positive I do.”
Timlin, captain of the patrol:
“Q. Well, do you remember whether or not Lieutenant Manning pulled up his horses that night,' before he reached Dumaine street? A. Yes, sir; twice, after we crossed the bridge that night — at. St. Peter street and at Dumaine street.”
After plaintiff recovered consciousness, he was taken to the Charity Hospital, where his left foot was put up in a plaster bandage. He was then taken home, and he called Dr. De Grange to remove the bandage, which had become insupportable. The doctor says:
“I took it .off and found that he had suffered a contusion of the foot, with a strain, or sprain, of the ankle. * ? * Some of the ligaments on the anterior aspect of the foot, outer and lateral, were very likely torn. There was considerable swelling. * * * He was unable to walk, possibly, for a couple of weeks, and then he1 was unable to attend to his duties up to the time I sent him back to work.”
Other evidence shows that plaintiff was able to get about on crutches at the end of two weeks, and that he was able to return to his work on November 6, 1908. something over five months after he had been injured. It also appears that a number of his teeth were knocked out, broken, or loosened in the collision, necessitating the services of a dentist, and that, save with respect to his teeth, his injuries are not permanent.
Opinion.
Defendant, after pleading the exceptions, •“no cause of action” and “vagueness,” answered, denying negligence, and alleging that—
“your respondent was in the discharge of its duties upon the night in question; * * * that it was specially authorized to be where it was at the time of said collision, equally with the engine or apparatus of the New Orleans Eire Department, by virtue of the law in such cases made and provided, and especially of Act No. 115, p. 186, of 1902.”
Turning to the act referred to, we find that it is entitled:
“An act to provide for the organization and maintenance of associations formed for the protection and saving of human life and property, in case of fire, in cities having a population of 50,000, or more, and providing for the enforcement of the provisions of this act,”
—and that it provides, in substance, as follows, to wit:
Section 1 authorizes the fire insurance companies, doing business in any city having 50,000 or more of population, to organize an association, to be known as the “Fire Insurance Patrol” of such city, for the purpose of protecting life and property from fire, and provides that the association shall make no charge for its services and no discrimination between insured and uninsured property.
Section 2 provides that every company regularly licensed and authorized to do business shall be eligible to membership in the association, and shall have one vote for each $1,000 of premiums reported for assessment.
Section 3 provides that, when two-thirds of the companies in any city shall have formed an association, the officers shall file a copy of the constitution and by-laws and list of members with the Secretary of State, who shall give his approval if the association has been formed in accordance with the law.
Section 4 confers upon associations organized under the law power to provide and maintain a corps of men with suitable apparatus, to save and preserve life and property, at and after, fires, and authorizes such men to enter buildings and protect, save, and remove property—
“provided, however, that nothing in this act shall be so construed as to lessen, in any way, the authority of the fire department * * * or to warrant or justify any interference with them in the performance of their duties.”
*633 Section 5 provides that tiie teams and apparatus of such associations shall have the same right of way whilst going to a fire as the fire department—
“* * * and any violations of the street right of such associations shall be punished in the same manner as is¡ or may hereafter be, provided for the violations of the rights of fire departments,” etc.
Section 6 authorizes the associations, in order to carry out the purposes for which they may he organized, to require a statement to he furnished annually, by all corporations, associations, underwriters, agents, or persons, of the aggregate amount of premiums received for insuring real and personal property, in the cities in which such associations are domiciled, from loss hy fire, for the 12 months next preceding the 31st day of December of each year—
“* * * said returns shall spe'cify the amount of gross premiums written by such insurance company, association, or agent, during the said 12 months, on all policies of all kinds on risks located in cities in which fire insurance patrol associations may have been organized under the provisions of this act, deducting only return premiums paid and premiums paid for reinsurance in companies authorized to do business in the state of Louisiana, after deducting from such premiums paid for reinsurance, return premiums received on such cancelled reinsurance during the said 12 months. No reinsurance in companies not authorized to do business in Louisiana shall be deducted.”
Section 7 authorizes the president, hoard of directors, or executive committee, of any association organized under the act to fix the assessments of the members in proportion to premiums returned as received, such assessments to be based on the estimated expenses for the year, and not to exceed 2 per cent, of such premiums, and to be paid quarterly, in advance.
Section 8 makes it the duty of the secretary of any such association to report to the Secretary of State any companies neglecting to make returns of premiums, and to pay the amounts assessed against them, and makes' it the duty of the Secretary of State to collect such amounts and pay them over to the association.
Section 9 makes it the duty of the Secretary of State to revoke the license of any company failing to pay the amount of its assessment within 15 days from demand, such revocation to stand until payment shall have been made.
Section 10 authorizes associations already formed to continue upon accepting the provisions of the act.
The act contains no repealing clause, and, at the time of its passage, there was already on the statute books “an act to form a fire department for the city of New Orleans,” etc. (being No. 83, p, 114, of 1894), section 15 of which reads:
“The officers and men of the fire department, with their apparatus of all kinds, when on duty, shall have the right of way to any fire and in any highway, street, or avenue, over any and all vehicles of any kind except those carrying United States mail; and any person, in, or upon, or driving, any vehicle who shall refuse the right of way, (to) or, in any way obstruct, any fire apparatus or any of said officers while in the performance of duty, shall be deemed guilty of a misdemeanor,” etc.
Construing the two laws together, and considering that the purpose of the act of 1894 in providing a public necessity at public expense is wholly public, whilst the main purpose of the act of 1902 is to enable certain corporations, established for private gain, to protect their own interests, we think it clear that whilst, as between the insurance patrol and the public, the patrol has the right of way in the streets for its apparatus, the paramount right granted to the fire department remains wholly unaffected, for it will be observed that, though section 5, p. 188, of the act of 1902, provides that the teams and apparatus of the association (or patrol)—
“shall have the same right of way, whilst going to a fire, as the fire department * * * and any violation of the street rights of such association shall be prosecuted in the same man *635 ner as is, or may, hereafter, be provided for the violation of the rights of the fire department”
—the preceding section (4), which authorizes the association to maintain and use its apparatus, etc., contains the clause (qualifying .ail the powers conferred by the act):
“Provided, however, that nothing in this act shall be so construed as to lessen, in any way, the authority of the fire department of the city in which such association shall have its domicile or to warrant or justify any interference ■with them in the performance of their duties.”
The obligation which rests upon the officers and men of the patrol, in responding to .a fire alarm, to be on the lookout for the apparatus of the fire department, is therefore more imperative than is that of the officers .and men of the fire department to be on the lookout for the apparatus of the patrol.
But, apart from that obligation, we are of opinion that liability for the accident in question is fixed upon the defendant, with reasonable certainty, by the testimony, mainly, of its own witnesses. The testimony of King, to the effect that engine 26 and the patrol wagon came down Galvez street, side by side, and that he called to the driver of the engine to pull up and let the wagon get ahead, because it had the best team, and because he did not want a collision, presents an unmistakable picture to the mind; and the fact that the wagon reached Dumaine .street 300 feet in advance of the engine does not imply that it had slackened the speed which had enabled it to secure that advantage, nor is there lacking affirmative testimony on the subject. Thus, Caverelo, the fireman of the truck, testifies that he saw the wagon as plainly as he saw the attorney who was interrogating him, that he did not jump off the truck, because he “never had the slightest idea that they were going to hit it,” as they had plenty of room in which to slack up, but that “they just continued on at a full jump. If it had been a car, it would be the same thing; they would have gone clear through it.” And the testimony of Reichert, a bystander at the time, is much to the same effect. But, accepting as true the testimony of all the witnesses who were on the wagon, to the effect that the driver pulled up the horses, slacked their speed, and had them under control, before the wagon “reached Dumaine street, upon which there was a car track,” and we have the unexplained, and unexplainable, fact that, with the horses under control, the wagon was allowed to run into the side of the truck, at a point some 12 or 15 feet behind the heads of the truck horses, with such force as to break its own pole and overturn the truck, though the latter is said to weigh about half as much again as the wagon.
Counsel for defendant propounds the theory that the fire insurance patrol, as authorized and established by the act of 1902, is a public charity, to which the doctrine of re-spondeat superior has no application, and they refer the court to .certain authorities as supporting their view, to wit: A. & E. Enc. of Law (2d Ed.) vol. 20, p. 1205, to the effect that:
“As the duty to extinguish fires is a public service, a municipal corporation is not liable for the negligence of its firemen or the inefficiency of its fire department.”
Beach on Public Corporations, vol. 1, p. 754, § 744, to the same effect.
The doctrine thus stated is founded upon the familiar principle that a municipal corporation is not liable in damages for its failure to discharge, or the manner in which it discharges, an obligation which is discretionary or judicial, as contradistinguished from those that are absolute or perfect, and that the obligation with respect to the maintenance of a fire department and the extinguishment of fires belongs to the latter class.
Yule et al. v. City of New Orleans, 25 La. Ann. 394, in which it was held that:
“The Eiremen’s Charitable Association has always been a voluntary one; its members are *637 not paid; and tiie $12,000 [should be $120,000] per annum allowed them out of the city treasury is only a subsidy to enable the association to carry out. its objects.”
The only defendant before the court in the case cited was the city of New Orleans, concerning the relations of which with the plaintiff, the court said:
“There is no contract, expressed or implied, between the citizens and the city of New Orleans to indemnify them for any loss which may occur to them by reason of the burning down of their houses, except in cases specially provided by law”—
which doctrine is supported by a number of adjudications by the courts of other states mentioned in counsel’s brief.'
We are next referred to the case of “Fire Insurance Patrol v. Boyd, 120 Pa. 624, 15 Atl. 553, 1 L. R. A. 417, 6 Am. St. Rep. 745, from the opinion in which, the following excerpt is made, to wit:
“The insurance patrol company, whose object, as described by its charter, is ‘to protect and save life and property in, or contiguous to, burning buildings, and to remove and take charge of such property or any part thereof, when necessary,’ is a public charity, although the evidence shows that it is a corporation without capital stock or money capital, and that it is supported by voluntary contributions, derived from different insurance companies ; it appearing that, in protecting property, no distinction is made between insured property and uninsured property, and that no profits and dividends are made and divided among the corpora-tors. Such corporations, having no funds which have not been contributed for the purposes of charity, cannot be rendered liable for injuries occasioned by the negligence of servants or agents.”
We are unable to concur in the view that, where' private corporations, engaged in the business of insuring property against fire, in their own interest, and with a view to minimizing. their own losses, employ agents to save the property insured by them, or to aid in the' extinguishment of the fire insured against, they are to be considered charitable organizations, merely because, in the instrument under which they are allowed to associate themselves .for the employment of such agents, it is declared that the purpose is to save life, as well as property, and that no discrimination is to be made between property that is insured and that which is not, nor yet because there is no provision in the instrument for the formal declaration of dividends. The Supreme • Court of Massachusetts, in a case similar in most respects to that now under consideration, has disposed of the theory suggested by the learned counsel, and of the decision in the case above referred to, as follows:
“The chief grounds on which it is contended that the work of the corporation is a public charity are the language which refers to the preservation of life and property, in general terms, and the practice of the defendant to have no regard to ownership, and to make no distinction between insured and uninsured property. But these are of little significance in view of other provisions of the statute, and especially in view of the fact that it is impracticable for the defendant to conduct its business in any other way. The defendant places great reliance upon Fire Insurance Patrol v. Boyd, 120 Pa. 624, 15 Atl. 553, 1 L. R. A. 417, 6 Am. St. Rep. 745; which somewhat resembles the case at bar. But in that case membership in the corporation was open to everybody, and the expenses were wholly paid by voluntary contributions. The facts so differed from those of the present case that, if the decision were binding-in this jurisdiction, it would not be decisive of the question before us. We are of the opinion that defendant is not a public charitable corporation, and that it is liable for the negligence of its servants. See Donnelly v. Boston Catholic Cemetery Ass’n, 146 Mass. 165, 15 N. E. 505; 5 New England Rep. 741; Coe v. Washington Mills, 149 Mass. 543, 21 N. E. 966.” Newcomb v. Boston Protection Department, 151 Mass. 215, 24 N. E. 39, 6 L. R. A. 778, followed in Bates v. Worcester Protective Department, 117 Mass. 134, 58 N. E. 274.
We concur in the view thus expressed by the Supreme Court of Massachusetts, and, holding that defendant is not a charitable organization, find it unnecessary to go further and consider the question whether, if it could be so regarded, it would be immune from liability for damages resulting from a negligent killing or injury, by its agent, of a municipal officer, acting in the discharge of his duty, upon a public street over which a right *639 of way, paramount to that of defendant, is granted him by law.
Judgment affirmed.
PROVOSTY, J., dissents.