## Lockhart's Estate

*Marriner & Wiley*, for accountant.

*A. Kirk Wrenshall* and *Ben H. Richman*, for exceptants.

CRUMRINE, P. J., April 9, 1934.—Clara B. K. Lockhart died December 1, 1931, leaving a will dated January 21, 1929. Her husband had predeceased her, and she left no children.

After certain specific bequests, the testatrix leaves the residue of her estate

to Citizens National Bank of Washington, Pa., as trustee to convert her estate, or such part as may be considered necessary, into cash, and invest and reinvest the same. In this connection, she gives specific directions as to the holding, leasing, and general control of her real estate.

Then, in item 7 of the will, she provides as follows:

"7. It being my will and desire that the income from my estate shall be used for the furtherance and benefit of the humane treatment of animals and to that end I direct

"(a) That my Trustee shall turn over each six months, after payment of the taxes, insurance and necessary administration expenses, to The American Humane Association, with headquarters at Albany, New York, the net income from my estate. It is my desire that The American Humane Association utilize 'Dixie Farm' as a shelter and rest farm and to employ such help and to purchase such equipment as is necessary to carry out this plan. I also desire the American Humane Association to devote such portion of my income to the employment of not less than one humane officer or officers as it may deem necessary to enforce the laws for the prevention of cruelty to animals in Washington County. Said work to include the home animals such as dogs, cats, etc., and farm animals, such as horses, cows, sheep, mules, etc., and where the same are improperly kept and where it is not practical to keep the same on 'Dixie Farm' that the same shall be humanely killed and sanitarily disposed of. The balance of the income from my estate shall be utilized by the American Humane Association for the furtherance of its work for animal protection, and as far as practicable to apply a great portion of said balance in the furtherance of humane education by reaching children directly and impressing the importance of such matters. It is my desire that my estate be administered in the manner heretofore indicated for the purpose of an example of kindness and consideration of the rights of others.

"(b) That my Trustee hereinafter named lease the surface of my farm or any part thereof in Buffalo Township, containing 155 acres, more or less, and known as 'Dixie Farm' to 'The American Humane Association', of Albany, New York, for a trial period of ten years at an annual rental of One ($1.00) per year, to be conducted during that period by the said Association as a shelter and rest farm for large and small animals, and said lease to be extended from time to time to said Association as long as the farm or any part thereof is used for this purpose as hereinafter set forth. Said Association shall have full control of the operation and use of the surface with the permission to alter, add to or tear down the buildings upon the place in order to properly develop the farm or any part thereof as a shelter and rest farm for small and large animals, and should any profit accrue from the operation of said farm it shall be regarded as a part of the income of my estate.

"(c) At the end of the said ten years trial period to be computed from the time of my death, it is my will that all facts concerning the operation of the said 'Dixie Farm' as a shelter or rest farm shall be submitted to the Judge of the Orphans' Court of Washington County, Pennsylvania, to the end that he may decide as to whether it is practical to continue the operations of the surface of said 'Dixie Farm' as a shelter and rest farm for domestic animals or whether the same should be abandoned for that purpose. If, in his opinion, the ten year trial period has not been sufficient, I hereby authorize him to extend the same for an additional trial period of five years, and so on, and at the end of any period the matter may again be submitted to the Judge of the Orphans' Court. Should the said Judge approve the plan, after hearing the facts, it is my desire that on petition of my Trustees or the Association, the matter may be again

submitted to him at the end of any five year period. The Judge of the Orphans' Court at the end of any of the periods herein indicated, after hearing the testimony, shall be the sole judge and his decision shall be final as to whether or not the use of the 'Dixie Farm' or any part thereof shall be continued as a rest and shelter farm for domestic animals, and should he decide that the same was impractical and should be abandoned for this purpose, it is then my will and I hereby direct my Trustee to retain as a part of the corpus of my estate the surface of said 'Dixie Farm' and handle the surface of said farm in any manner which in its discretion will seem advisable and any income derived therefrom shall be considered income of my estate."

After nominating Citizens National Bank as her executor and trustee, she again summarizes its powers, in numbered paragraphs, the fourth of which reads as follows:

"4. It is my will and intention that my said Executor and Trustee shall in so far as possible be possessed of full power to act in and about the management of my estate, consulting with Marriner, Wiley & Wiley, as counsel for said estate, exactly as I might or could do if living, taking into consideration at all times my intention of carrying out the work which is hereinbefore mentioned for my estate."

The will is witnessed by Mary G. Driehorst and John F. Wiley. John F. Wiley is a member of the law firm of Marriner & Wiley, now representing the accountant, and was, at the time the will was drawn, a member of the firm of Marriner, Wiley & Wiley, referred to in subparagraph 4, last above quoted.

Although the will bears date January 21, 1929, it was actually executed about July 8, 1929. It was dated back because, at the time the will was executed, Mrs. Lockhart's attorney explained to her that if she should die within 30 days from the date of its execution the bequest to charity would fail. With this information, the decedent insisted on using a date 6 months prior to that of the actual execution.

The decedent was an elderly woman at the time of her death. She had always been peculiarly attached to and interested in animals, and this interest became more pronounced in her later years.

The foregoing are the salient facts.

The matter comes before us at the audit of the executor's account in the form of exceptions to that part of the audit petition which suggests the award of the residue to the testamentary trustee for the charitable purposes set forth in the will.

These exceptions really amount to an argument advanced by the heirs of the decedent that the trust established by the will should fall, an intestacy be declared as to the residue, and distribution be made to the heirs at law. The four propositions advanced are as follows:

"1. The devise and bequest to Citizens National Bank, Washington, Pa., in trust, in decedent's will contained is void as a violation of the rule against perpetuities unless the same should be deemed to be a charitable trust.

"2. If the trust attempted to be created by said will should be deemed to be a charitable trust, the same is void because the said will was not attested by two disinterested witnesses as required by the Wills Act of 1917.

"3. In antedating the will to defeat the intent of the Wills Act of 1917, insofar as the same relates to devises and bequests for charity or for charitable purposes, the testatrix was guilty of fraud, and any devises and bequest for charity are void because of such fraud.

"4. In either event, the heirs at law and next of kin of testatrix will take to the exclusion of Citizens National Bank, Washington, Pa., trustee."

Assuming as true the first proposition, that the bequest violates the rule against perpetuities unless it be construed as a charitable trust, we shall consider first the question whether the will does create a trust for a charity.

That there is a trust created is clear. The four well-recognized requisites—(1) sufficient words, (2) a definite subject, (3) a certain object, and (4) sufficiently declared terms—are all present: Bispham, Equity, sec. 65; Smith's Estate, 144 Pa. 428; Ashman's Estate, 223 Pa. 543.

This is not questioned by the exceptants, but they say it is not a "charitable" trust, although admitting that the American Humane Association is a charitable organization. Their position is that the purposes to which the cestui que trust is limited in the use of the funds given are not "charitable uses"; that the care of cats, dogs, horses, and other domestic animals does not, under the cases in this State, rise to the dignity of a "charity" within the meaning of the Act of May 23, 1895, P. L. 114, sec. 1, which expressly relieves charitable uses from the operation of the rule against perpetuities.

Webster defines charities as "eleemosynary appointments [grants or devises] including relief of the poor or friendless, education, religious culture, and public institutions". The new Standard Dictionary gives it very briefly but aptly: "A gift of real or personal property for the public benefit". The Supreme Court of Pennsylvania, in Fire Insurance Patrol v. Boyd, 120 Pa. 624, 645, says:

"A charity, in legal sense, may be more fully defined as a gift to be applied consistently with existing laws, for the benefit of an indefinite number of persons, either by bringing their minds or hearts under the influence of education or religion, by relieving their bodies from disease, suffering or constraint, by assisting them to establish themselves in life, or by erecting or maintaining public buildings or works, or otherwise lessening the burdens of government."

In this definition, I think the last phrase, "lessening the burdens of government" is important as giving perhaps the best rule-of-thumb test of what constitutes a charity. A private contribution to the public welfare might not be too broad a definition.

I find no appellate case in this State, and none has been cited in the very excellent and exhaustive briefs submitted, deciding that the care and humane treatment of animals comes within the class of charitable purposes, although it has been so found in other jurisdictions. See note in 66 A. L. R. 465.

Common decency and humanity, however, stamp the cause as a worthy one, and it has definite statutory recognition in this State. Cruelty to animals has been made a criminal offense by our acts of assembly: Acts of March 31, 1860, P. L. 382; Marsh 29, 1869, P. L. 22; April 24, 1903, P. L. 296.

Societies for the prevention of cruelty to animals have been given a semi-official status by the Acts of April 3, 1872, P. L. 38, and June 20, 1891, P. L. 378.

The Act of April 13, 1921, P. L. 132, expressly gives to county commissioners the right to appropriate money for the support of societies incorporated in this State for the prevention of cruelty to animals.

It is true that Mrs. Lockhart went to extreme and perhaps foolish lengths in the minute and intricate system which she provided for the care of animals, and if the test were whether or not she used good judgment in some of her provisions, I would very quickly give my opinion in the negative. But the same thing could be said as to a large percentage of the wills we are called on to construe.

Regardless of that fact, however, the purpose was lawful, it was in the interest of a well-recognized matter of public concern, and most important, it was her money to give as she saw fit.

To quote once more Mr. Justice Mitchell in the leading case of Dulles' Estate, 218 Pa. 162:

"The fundamental law of Pennsylvania in regard to property, which ought not to require restatement as often as it does, is that the owner may do as he pleases with it provided the disposition be not to unlawful purposes, and what he may do himself he may do by agent while living, or by executor after death. This principle disposes of this case."

I find, therefore, that this bequest constituted a charitable trust within the meaning of the act of assembly.

But the exceptants say that if this is a charitable trust it cannot be given effect because it offends section 6 of the Wills Act of June 7, 1917, P. L. 403, which requires that no devise or bequest in trust for a charitable use shall be given effect unless the will be attested by two "credible, and, at the time, disinterested witnesses". They say that since Mr. Wiley, one of the two attesting witnesses, was, at the time the will was executed, a member of the law firm of Marriner, Wiley & Wiley, designated by the will as legal consultants, he was not a "disinterested witness" within the meaning of the act.

Section 6 of the Wills Act of 1917, supra, is a substantial reënactment of section 1 of the Act of June 7, 1911, P. L. 702, which amended section 11 of the Act of April 26, 1855, P. L. 328, with but slight change, except to add the proviso that an interest in a bequest or devise other than the charity did not disqualify. Decisions under the earlier acts are therefore applicable here, and there are many of them.

While originally there was some doubt whether one appointed executor by the will was a "disinterested witness" under the act, it was finally settled that he was: Snyder v. Bull, 17 Pa. 54; Jordan's Estate, 161 Pa. 393; Kessler's Estate, 221 Pa. 314. The reason for this decision, as given in Jordan's Estate, supra, is as follows:

" 'Granting that the office of executor is a beneficial one, he was not executor though nominated; for no one living has an executor. But he might eventually become one? True, but he might not. He might die in the lifetime of the testator, or his nomination might be revoked, or he might not find it convenient to accept:' Snyder v. Bull, 17 Pa. 54. When the attestation takes place, it is altogether uncertain and contingent whether he will ever be called upon to perform the duties of executor. But, even in the event of his assumption of the duties, he can receive no more than compensation for the services which he may have rendered; and there is no pretence in the present case that this compensation will be to any extent affected by the result of the charitable bequest. He could have had no conceivable motive in unduly influencing the action of the testator nor interest in the subject-matter of future controversy; and had, therefore, no 'legal interest' which could have disqualified him as an attesting witness. Prior to the passage of the act of 1855 his competency as a witness to the execution of wills was the rule in this state: Snyder v. Bull, 17 Pa. 54; Lomis v. Kellogg, Id. 60; and that act, as already seen, made no change in the test: Combs's Ap. [105 Pa. 155], supra."

This reasoning applies with equal force to legal advisers suggested by the testator. They are paid only for what they do under the supervision of the court. While, in the case of executors and representatives, there has grown up a custom of allowing compensation on the basis of a fixed commission based on the size of the estate, this is *only* a custom, and the actual test is, What were the services worth? This is identically the same as the test of an attorney's compensation.

Counsel for the exceptant admits that this is true in the case of ordinary services rendered by counsel, but says that in the present case the powers of the trustee are so broad that counsel could lead it into many strange paths

which would necessitate constantly increasing legal advice with consequently increasing fees to the lawyers.

While such a situation is conceivable, it is not reasonable, and the distinction is too fine-spun. Substantially the same argument is answered by the Supreme Court in Johnson's Estate, 249 Pa. 339. In that case, one of the witnesses to the will was named as the member of an advisory committee, with which the trustee was to consult as to the administration of the trust. (Practically the same situation as in the case at bar.) It was said in the opinion:

"It is true that the testator named an advisory board to act in conjunction with the trustee in all matters connected with the administration of the charity, and it must be conceded that great confidence was reposed in this advisory board by decedent. It is also apparent that the testator desired his trustee to have the benefit of such suggestions and advice as he thought the advisory board would give it, and learned counsel for appellant argue with great force that the testator intended this advisory board to be vested with all the powers required to fully administer the charity. To sustain this contention would have the effect of reading out of the will all the provisions relating to the duties of the trustee. Such a construction would make the trustee a mere figure-head without power or authority to administer the residuary estate, although legally responsible to account for the proper administration of the trust. Our conclusion is that the testator intended what the language of his will primarily means, which is, that his trustee is to be vested with full power and authority to administer the trust estate, and that the advisory board is to act in the capacity of advisors in the administration of the charity. When so understood the difficulties of the present case largely disappear, because under such circumstances, to hold that Christy had such an interest in the charity as to disqualify him as an attesting witness to the will would strain the language of the Act of 1855 beyond the point of reasonable interpretation."

In the instant case, the parenthetical provision, "consulting with Marriner, Wiley & Wiley", is at best only precatory. They received no legacy or other interest under the will. The trustee could refuse to employ them for any valid reason and employ lawyers of its own choosing. If they were employed, they would be paid nothing unless they earned it, and as to that the court is the final judge.

It is not necessary to consider at length the numerous cases cited by counsel and quoted at length in the very able briefs submitted. So far as I have found, there is no case deciding this precise question, whether a lawyer suggested as legal consultant for the executor or trustee is a "disinterested witness" within the meaning of the act, and the reason for such lack of authority is obviously that just given—that the individual or firm named as legal adviser acquires no actual right or interest of any kind under the purely precatory words of the will, which have no other effect than to impose a quasi-moral obligation on the executor or trustee.

"It has been decided that the selection of counsel cannot be controlled by a testator; that the provision in a will nominating and appointing a person by name as 'advisory and counsel' to assist the executor in winding up the business of the estate, is not binding upon the executor; and that he may employ other counsel, whose reasonable fees will be allowed out of the estate, or act without counsel": 3 Woerner, American Law of Administration, 1777.

The reason for this rule is clearly stated by the New York Court of Appeals in the case of Matter of Caldwell, 188 N. Y. 115, 121:

"The law of this state does not recognize any testamentary power to control executors in the choice of the attorneys or counsel who shall act for them in

their representative capacity. They may incur a personal liability for the conduct of their lawyers, and hence they are beyond the control of their testator in making the selection. Such a provision, therefore, as this will contains in reference to the attorneys to be employed is to be regarded merely as expressive of a wish on the part of the testator. . . ."

I am of the opinion that John F. Wiley was a "disinterested witness" within the meaning of the act.

The next proposition advanced by the exceptants is that the antedating of the will by the testatrix to avoid the possibility of the charitable bequests failing by reason of her death within 30 days was a fraudulent act, which vitiated and rendered void the bequest and devise in question.

It is difficult to see how this act could be designated as a fraud. The testatrix was not trying to obtain something from another by a dishonest act. She was giving her property away and, regardless of her attorney's advice, thought she could avoid the consequences of her possible death within 30 days by using the date of her former will.

The purpose of section 6 of the Wills Act of 1917, and that of prior acts on which this is based was, of course, to prevent imposition on a testator who, because of a knowledge of approaching death, was likely to feel that the future might be secured by giving what he had to a worthy cause.

The testatrix here reversed the situation, and attempted to escape from the restrictions imposed for her benefit. As it turned out, she lived for more than a year after the actual date of execution. Her attempt to waive the safeguards of the act was a useless one. It did not prejudice any person in the slightest degree.

We cannot even infer that there was any intention on her part to do anything more than adopt what to her seemed a plausible solution for an annoying and technical legal restriction. Certainly her attorney advised her otherwise, but clients, particularly ladies, who are willing to trust their own legal conclusions rather than those of their lawyers, are not unknown to the profession. What more simple than a nunc pro tunc execution, which would satisfy everybody?

Not only was there no fraud perpetrated, but there was not even a fraudulent intent. She merely made a poor guess at the law.

It is well settled that a date is not necessary to a valid will, nor does an incorrect date vitiate it: Armstrong's Estate, 70 Pitts. 25; Bates's Estate, 286 Pa. 583.

In this connection, I wish to say that the court fully appreciates the fairness of Mr. Wiley in voluntarily placing on the record the full details as to the incorrect dating of the will.

Since, as stated above, the "exceptions" filed are really statements made by the heirs as to their position on the question of distribution of this estate, no formal decree dismissing them is necessary.

A decree of distribution in accordance with the foregoing opinion is filed herewith.                    From Harry D. Hamilton, Washington, Pa.